**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **JOHN LYDDON,** | **1:03-CV-05502 OWW TAG** |
| **Plaintiff,** | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| **v.** | |
| **ALFONSO ROCHA-ALBERTSEN, et al.,** | |
| **Defendants.** | |

This case was tried to the Court sitting without a jury on April 22, 2006 through May 5, 2006.  The parties submitted proposed Findings of Fact and Conclusions of Law which were electronically filed on May 19, 2006, whereupon the matter was submitted for decision.

Plaintiff John Arthur Lyddon ("Lyddon") was represented by Roger K. Vehrs, Esq.  Defendants Alfonso Rocha-Albertsen ("Rocha-Albertsen") and Hilario Cuellar-Abundiz ("Cuellar-Abundiz") were represented by Diana R. Griffiths, Esq.  Testimony was taken and evidence was presented in open court, followed by the oral arguments of the parties.  The following findings of fact and conclusions of law are entered pursuant to Fed. R. Civ. P. 52(a).  To the extent that any findings of fact and conclusions of law could be interpreted as the converse it shall be treated as such.

**1**

**BACKGROUND**

In 1997 while working for Baker & McKenzie, Rocha-Albertsen was assigned to represent Lyddon in a lawsuit filed against him in Mexico.  In 1998 Rocha-Albertsen stopped working for Baker and McKenzie and formed his own practice.  Pursuant to a contingency arrangement, Lyddon hired Rocha-Albertsen as his personal attorney in Mexico.  Lyddon paid Rocha-Albertsen a monthly fee of $2,500 in exchange for Rocha-Albertsen's legal services involving any legal matters, including legal matters pertaining to the sale of a house in Cabo San Lucas.

Lyddon alleges that Rocha-Albertsen was indebted to Cuellar-Abundiz, an attorney in Mexico, for legal services.  As a result, Lyddon claims that Rocha-Albertsen and Cuellar-Abundiz conspired and agreed to forge Lyddon's name on a promissory note claiming that Lyddon owed the sum of $500,000.00 for legal services and business advice.  Lyddon argues that he was "tricked" into signing this note, which was written in Spanish, a language he can not read.  Lyddon also alleges that Rocha-Albertsen assigned the note to Cuellar-Abundiz, who is currently seeking to appeal an order rendered against him in Mexico and to collect on the forged, false and fraudulent promissory note. Lyddon claims that Rocha-Albertsen also sold a property right for $40,000 along with the sale of the Cabo San Lucas property. Rocha-Albertsen was not authorized to sell this property right nor did he consult with Lyddon before selling it.

Lyddon is a citizen in the State of California.  Rocha-Albertsen and Cuellar-Abundiz are attorneys engaged in practicing

law in Mexico.  Lyddon brings claims for breach of contract, fraud, conspiracy, a violation of California Welfare Code §15610(f), a violation of California Business Professions Code 17200, and for declaratory relief.

**PRELIMINARY MATTERS**

**I.  LEGAL STANDARD**

In trials without juries, Fed. R. Civ. P. 52(a) requires a court to find the facts specially and sate separately its conclusions of law thereon.  *See Barnett v. Sea Land Service,* 875 F.2d 741, 744 (9th Cir. 1989).  Even upon review, due regard is given to the district court's judgment as to the credibility of the witnesses, Fed. R. Civ. P. 52(a) and Courts of Appeal will give deference to a district court's choice between two permissible views of evidence provided it is not clearly erroneous.  *Moody v. Proctor*, 986 F.2d 239, 241 (8th Cir. 1993).

**II.  EVIDENCE**

The following exhibits were admitted into evidence during trial:

| EXHIBIT NO. | DESCRIPTION |
| --- | --- |
| 1 | Cuellar-Abundiz Initial Retainer |
| 2 | Email from Rocha & Assoc. RE: Lyddon's Bills |
| 3 | Email from Rocha & Assoc. RE: Bills |
| 4 | Rocha & Associates promotional website pages |
| 5 | Baker & McKenzie law firm retainer RE: Rocha |
| 6 | Email from Rocha & Associates to Vicky RE: Advance |
| 7 | Email from Rocha-Albertsen to Vicky RE: moneys owed Lyddon |
| 8 | Retainer with hourly charges signed by Rocha-Albertsen and Lyddon |

| 9 | Two faxes from Rocha-Albertsen to Lyddon RE: Retainers and Jaime Berger |
| 10 | Fiduciary agreement for Rocha-Albertsen and Norma Perez |
| 11 | Promissory note for $500,000.00 |
| 12 | Calendar for Rocha-Albertsen's office |
| 13 | Various calendar documents from Cuellar-Abundiz |
| 14 | Engagement letter from Cuellar-Abundiz to Lyddon |
| 15 | Cuellar-Abundiz billing with hourly breakdown |
| 16 | Payment by Lyddon of Cuellar-Abundiz bill |
| 17 | Agreement for the purchase and sale of the property in Cabo San Lucas |
| 18 | Deposition of Cuellar-Abundiz |
| 19 | Deposition of Rocha-Albertsen |
| 20 | Deposition of Robert Brewer |
| 21 | WITHDRAWN AT TRIAL ON May 3, 2006 |
| 22 | **BLANK** |
| 23 | **BLANK** |
| 24 | **BLANK** |
| 25 | **BLANK** |
| 26 | Summary of checks with Bates stamps from Lyddon to Rocha-Albertsen admitted into evidence on May 3, 2006. |
| 27 | Two page handwritten document representing files Rocha-Albertsen worked on for Lyddon admitted into evidence on May 4, 2006. |
| 28 | Color paper admitted into evidence on May 4, 2006. |
| 29 | Letter from Cuellar-Abundiz to Rocha-Albertsen requesting payment of fees admitted into evidence on May 5, 2006. |
| 30 | Billing statement from Cuellar-Abundiz to Rocha-Albertsen offered in trial on May 2, 2006. |

//

//

4

### FINDINGS OF FACT

To the extent that any Findings of Fact can be interpreted as a Conclusion of Law, it may be so construed.

**I.   THE PARTIES**

    **A.   JOHN ARTHUR LYDDON**

1.   Plaintiff John Arthur Lyddon is an American citizen. He is 74 years old.

2.   He graduated from Arizona State University at Tempe with a degree in Business.

3.   Lyddon was also in the U.S. Air Force for two years.

4.   Lyddon entered the gas station business and eventually became involved with the transportation, brokering, and refining of fuels, as well as drilling for oil.

5.   Lyddon resides in Bakersfield, CA.  He also conducts business in Bakersfield, CA and has been doing so since 1973.  He maintains a business office in Bakersfield, CA, which opened in 1975.

6.   Vicky Campbell is Lyddon's administrator at his office in Bakersfield, CA.  She was responsible for making payments to Lyddon's attorneys.  Attorneys fees payments were always approved by Lyddon or Clyde Frederickson ("Frederickson"), Lyddon's business manager, before payment.

7.   All attorneys fees paid to Mr. Rocha-Albertsen were paid out of Lyddon's office in Bakersfield, CA.

8.   Lyddon has residences in Las Vegas, NV, Corona Del Mar, CA, and Baja California, MX.

9.   Lyddon first visited Cabo San Lucas ("Cabo") when he was in his 20s, sometime in the early 1960s.  It was still a very

**5**

small town that contained a tuna cannery.

10.   In the late 1970's Lyddon acquired a small residence in Cabo for $40,000. Lyddon added a second story to the property. During the same time period Lyddon acquired a vacant piece of real property in Cabo for $30,000.

11.   After acquiring these first two properties, Lyddon in 1984 acquired a larger real property that was bordered on two sides by the real property he already owned.   Lyddon paid $400,000 for that property.   The larger property had beach front.

**B.   ALFONSO ROCHA-ALBERTSEN**

12.   Alfonso Rocha-Albertsen is a licensed attorney in Tijuana, MX. He graduated from the University in Mexico City in 1981.   He took and passed his bar exam in 1984 and has been a licensed attorney since then.   He is licensed on a federal level and is able to practice law throughout Mexico.

13. In 1994 Rocha-Albertsen joined the United States law firm Baker & McKenzie and began working for the firm in the City of Tijuana.   He was with Baker & McKenzie for four years.

14.   In 1997 while working for Baker & McKenzie, Rocha-Albertsen was assigned to represent Lyddon in a lawsuit filed against Lyddon by another attorney in Mexico for unpaid attorneys fees.   Rocha-Albertsen was responsible for investigating the dispute over a $114,000 check Lyddon gave to one of his former attorneys, Jaime Berger ("Berger").

15.   Rocha-Albertsen represented Lyddon in the lawsuit filed by Berger in Mexico.

16.   Rocha-Albertsen also traveled to the United States to assist attorney Robert Brewer ("Mr. Brewer") with related

**6**

litigation filed in the United States regarding the Berger
attorneys fees dispute.

17.   In 1998 Rocha-Albertsen stopped working for Baker and
McKenzie.   That same year he formed his own practice, Rocha &
Associates, where he is the managing partner.

18.   Rocha-Albertsen created a webpage for Rocha &
Associates in 2000.   The website advertises his legal services in
English and is accessible to and seeks potential clients in
California.

19.   Rocha-Albertsen also maintained a telephone number in
Chula Vista, CA.   He would sometimes answer this telephone number
himself.

20.   When Rocha-Albertsen entered his own law practice,
Lyddon followed him rather than stay with Baker and McKenzie.

21.   Rocha-Albertsen stopped working for Lyddon around
November or December 2002.

22.   At the time Rocha-Albertsen was working for Lyddon, his
normal hourly rate for his services was $100 an hour.

23.   Rocha-Albertsen is not a member of the California Bar
Association.

24.   When Rocha-Albertsen spoke to Lyddon, the conversations
were in English.

25.   Rocha-Albertsen became a social friend and visited and
traveled together with Lyddon on several occasions in Mexico and
the United States.

   **C.   HILARIO CUELLAR-ABUNDIZ**

26.   Hilario Cuellar-Abundiz ("Cuellar-Abundiz") is an
attorney in Tijuana, MX.   He has been an attorney for over 30

**7**

years and 60% of his cases deal with collections.

27.  Rocha-Albertsen referred Cuellar-Abundiz's attorney services to Lyddon.

28.  The arrangement for payment of attorneys fees between Cuellar-Abundiz and Lyddon was an hourly arrangement.

29.  Lyddon paid Cuellar-Abundiz $12,500 for the services he provided.

30.  Cuellar-Abundiz stopped working on any legal matters for Lyddon in 1998.

31.  After the 1998 date Cuellar-Abundiz did not travel to the United States to do any business for Lyddon.

32.  When Cuellar-Abundiz worked for Lyddon in 1997 and 1998 he was never in the United States to work on Lyddon matters. Every contact that Cuellar-Abundiz had with Lyddon was in Tijuana, MX.

33.  Cuellar-Abundiz maintained a post office box in Chula Vista, CA. He opened it to take advantage of the increased reliability of the mail service.

34.  Cuellar-Abundiz has another post office box in San Ysidro, CA that he has had for eight to ten years.

35.  It is common practice that all of Cuellar-Abundiz's clients be sent a billing statement on a monthly basis for any unpaid fees owed to him.

## II.  LYDDON'S BUSINESS ADVISOR: CLYDE FREDERICKSON

36.  Clyde Frederickson III ("Frederickson") lives in American Fort, Utah.  He is married and has a family.

38.  He is employed by the firm Ratlin, Cohen, & Hults, accountants and advisors in Miami, FL.

**8**

39.   He has been directly employed with the firm since 2006 and as a contractor for them since 1984.

40.   Frederickson met Lyddon in 1984.  He is Lyddon's current Business Manager.  He is also a licensed pilot and on occasion flies with him in his airplane to different places.

41.   Frederickson also holds a medical power of attorney from Lyddon, as successor to Lyddon's only daughter.

42.   In performance of Frederickson's duties as Lyddon's Business Manager, Lyddon's normal practice was to advise Frederickson about any financial transactions that he was going to engage in before they happened.

43.   It was also common practice for Frederickson to review all payments for Lyddon's matters in Mexico before the payments were made.

44.   Frederickson does not believe there was ever any compensation discussion between Lyddon and Rocha-Albertsen to which Frederickson was not a participant.

45.   In the years that Frederickson has known Lyddon, Lyddon has used about 19 attorneys total.

46.   Frederickson met with Rocha-Albertsen in the United States on numerous occasions.

**III.   LYDDON'S FORMER ATTORNEY: ROBERT BREWER**

47.   Mr. Brewer has been an attorney for 31 years.  He has been in private practice in San Diego since 1982.

48.   Lyddon hired Mr. Brewer to represent him in the Berger lawsuit filed in the United States.

49.   Mr. Brewer represented Lyddon in the American litigation against Jaime Berger.

**9**

1    50.   Mr. Brewer met Rocha-Albertsen in relation to that
2    case.   Mr. Brewer was not involved in the Mexico litigation
3    against Berger.

4    51.   Rocha-Albertsen used Mr. Brewer's office in San Diego
5    on a number of occasions.

6    52.   After the Jaime Berger matter was concluded Mr. Brewer
7    referred a number of clients who needed an attorney in Tijuana,
8    MX to Rocha-Albertsen.

9    53.   Mr. Brewer did nothing more than allow Rocha-Albertsen
10   to use one of Mr. Brewer's four or five conference rooms to meet
11   with people.

12   54.   Mr. Brewer never participated in Rocha-Albertsen's
13   meetings with clients in San Diego.

14   **IV.   THE LYDDON ROCHA-ALBERTSEN RETAINER AGREEMENT**

15   55.   When Rocha-Albertsen opened his own practice, Lyddon
16   entered into a retainer agreement with Rocha-Albertsen where
17   Lyddon would be his first client and would pay Rocha-Albertsen
18   $2,500 a month. This agreement was an oral agreement.

19   56.   There are no written records of any agreement
20   specifying the terms and conditions of the attorney-client
21   relationship between Lyddon and Rocha-Albertsen.

22   57.   The agreement was from 1998-2002.   Rocha-Albertsen was
23   paid through December 2002.

24   58.   The $2,500 per month retainer agreement was to be the
25   full payment for all of Rocha-Albertsen's legal services for
26   Lyddon.

27   59.   At Rocha-Albertsen's request, the monthly payment was
28   increased by $300 more a month to compensate another attorney,

**10**

Norma Perez, who helped Rocha-Albertsen with Lyddon matters.

60.   As part of their compensation agreement, Lyddon agreed to pay Rocha-Albertsen for other lawyers who assisted him, at those lawyers' prevailing hourly rates.

61.   Rocha-Albertsen did not sit down with Lyddon to discuss compensation or send Lyddon a bill each month.

62.   Rocha-Albertsen did not keep a detailed record of the time that he worked on legal matters or incurred in performance of legal services for Lyddon.

63.   To the extent that Rocha-Albertsen did keep hourly records, the hours were written down on a yellow sheet of paper. The hours were not logged into a computer.

64.   When Rocha-Albertsen completed his services on Lyddon legal matters he did not send a final bill claiming an amount due to Rocha-Albertsen for legal services.

65.   Rocha-Albertsen notified Lyddon by telephone regarding final payment for his services.

66.   Rocha-Albertsen then filed a lawsuit seeking $25,000 for unpaid attorneys fees.

67.   Rocha-Albertsen never called Vicky Campbell, Lyddon's bookkeeper, to request a final payment for his services.

68.   During the period of time that Lyddon was paying him $2,500.00 a month, Rocha-Albertsen never told Lyddon, that he was billing Lyddon by the hour.

69.   Rocha-Albertsen would refer other attorneys to Lyddon and would ask Lyddon's permission to hire other attorneys to work on Lyddon's legal matters.

70.   Lyddon paid Rocha-Albertsen $2,500.00 a month and later

**11**

1   $2,800 a month for approximately 46 or 47 months, amounts in
2   excess of $20,000.

3       71.   Rocha-Albertsen and Lyddon never discussed an hourly
4   rate of payment for legal services.

5   **V.   THE LYDDON ATTORNEY CLIENT RELATIONSHIP WITH ROCHA-ALBERTSEN**

6       72.   During the four year attorney-client relationship
7   between Lyddon and Rocha-Albertsen, their professional
8   relationship also evolved into that of friendship.

9       73.   Rocha-Albertsen had constant contact with Lyddon
10  regarding his work on Lyddon's legal matters.

11      74.   Rocha-Albertsen and Lyddon often traveled together in
12  Lyddon's private plane to deal with Lyddon's legal affairs in
13  Mexico.  They stayed at the same hotel and ate breakfast and
14  dinner together.  They had drinks together.  They also frequented
15  a salsa bar in Mexico City.

16      75.   Rocha-Albertsen saw Lyddon on a weekly and sometimes on
17  a daily basis.

18      76.   Rocha-Albertsen's work for Lyddon required him to
19  travel frequently.  This travel included trips to Cabo San Lucas
20  to deal with Lyddon's property disputes.  Rocha-Albertsen also
21  traveled to California on several occasions to conduct business
22  with Lyddon.

23      77.   Rocha-Albertsen did not bill Lyddon for his travel
24  expenses.  Rocha-Albertsen and Lyddon had an arrangement where
25  Lyddon purchased the plane tickets or advanced money for the
26  hotel room or, alternately, Rocha-Albertsen paid for everything,
27  kept the receipts, and was reimbursed by Lyddon for such
28  expenses.

78.   On many occasions, Lyddon would not travel with Rocha-Albertsen, who traveled to places in Mexico where official actions on Lyddon's legal matters occurred.   Sometimes Frederickson or Norma Perez traveled with Rocha-Albertsen.   Other times Rocha-Albertsen traveled alone.

79.   In all the times that Frederickson traveled with Rocha-Albertsen, he never saw Rocha-Albertsen create or keep any time records.   Rocha-Albertsen never told Frederickson that he was keeping time records or that he was contemplating charging Lyddon for legal services by the hour.

80.   Since Lyddon was not always present when official actions took place involving his legal matters, Rocha-Albertsen or Norma Perez sometimes had Lyddon sign blank sheets of paper on stationary in case a document had to be drafted, when the document was not prepared in advance.

81.   The stationary Lyddon signed in blank was a cream colored 8.5 x 11 piece of paper.

**VI.   LYDDON'S CABO SAN LUCAS PROPERTY**

82.   Lyddon acquired an acre of land in Cabo San Lucas.   He eventually developed it and built a home on this land.

83.   The property was adjacent to a swim-up bar.   Lyddon also purchased a portion of the swim-up bar.

84.   Lyddon eventually decided to sell the Cabo San Lucas property.   Frederickson initially estimated the sale price of the property at $5 million.   However, the ultimate sale price of the property was for $2.8 million.

85.   Lyddon entered into negotiations with Canadian buyers to sell Lyddon's Cabo San Lucas property.   Lyddon had known the

1  Canadian buyers for a long time because they were owners of a
2  time share property contiguous to his property.

3      86.  The Canadians engaged in these negotiations with Lyddon
4  from Canada and from California.

5      87.  On September 23, 2002 Lyddon was in contact with the
6  Canadian buyers in Orange County, CA.

7      88.  At the time that Lyddon sold the property, Rocha-
8  Albertsen knew that Lyddon had initially wanted to sell it for $5
9  million.  The $5 million figure for the property was also printed
10 on the promotional flyer advertising the sale of the property.

11     89.  Rocha-Albertsen assisted Lyddon in the negotiations and
12 sale of the Cabo San Lucas property.

13     90.  Rocha-Albertsen reviewed the papers for the real
14 property sale and dealt with the taxes payable in Mexico as a
15 result of the sale.

16     91.  Rocha-Albertsen was separately paid $40,000 by other
17 parties for selling the right to a property interest in a small
18 piece of land between Lyddon's property and the swim-up bar.
19 This was a flat fee and not based on an hourly rate.

20     92.  Lyddon did not learn about the sale of this additional
21 property interest until he heard from the Canadians that they had
22 purchased the property right.

23     93.  Rocha-Albertsen did not disclose to or notify Lyddon
24 that he sold this property right.  Lyddon did not authorize
25 Rocha-Albertsen to sell this property right.

26     94.  Lyddon had intended to reserve the rights to the piece
27 of property Cuellar-Abundiz sold so as to assert a lawsuit
28 against a neighbor, Ana Bertha Sandoval ("Ana Bertha").  Lyddon

**14**

1    had continuing legal disputes with Ana Bertha.

2    95.  After the sale of the property right the Canadians then
3    settled the dispute with Ana Bertha.

4    **VII.   ATTORNEYS FEE LAW FOR THE STATE OF BAJA CALIFORNIA, MX**

5    96.  According to the Law for the Schedule of Fees for the
6    State of Baja, California, 10% of the sale of a property may be
7    paid to the attorney who assists with that sale.

8    97.  The 10% commission is based on the transaction  not the
9    amount of hours spent on the sale.  In this case, according to
10   Mexican law, 10% of the purchase price of the Cabo San Lucas
11   property is $280,000.

12   98.  Rocha-Albertsen never called Lyddon on the telephone to
13   tell Lyddon or otherwise communicated to Lyddon that Rocha-
14   Albertsen was entitled to or that Rocha-Albertsen claimed as
15   attorneys fees an amount equal to 10% of the sale price of
16   Lyddon's property.

17   99.  Rocha-Albertsen never spoke to or communicated to
18   Frederickson that Rocha-Albertsen was claiming entitlement to 10%
19   of the sale price.

20   100.  Lyddon never heard Rocha-Albertsen tell anyone that he
21   was entitled to 10% of the proceeds from the property sale.

22   101. Rocha-Albertsen never asked Lyddon for money out of the
23   sale and did not make a demand in escrow for 10% of the sale
24   price at the time of the sale of the Lyddon Cabo property.

25   102.  The court finds Rocha-Albertsen did not make such a
26   claim in the escrow or submit a bill to Lyddon, because there was
27   no such agreement.  Lyddon never agreed to pay to Rocha-Albertsen
28   10% of the sale price or any other amount for attorneys fees for

**15**

the sale.

103. Rocha-Albertsen knew that Mexican law prohibited an 18% fee compensation for the sale of real property and knew that such an agreement for compensation was unlawful.

**VIII.   ROCHA ALBERTSEN'S LEGAL SERVICES**

> **A.   LYDDON'S PUNTA CHIVATO PROPERTY**

104. Lyddon also had a residence in Punta Chivato, MX. With respect to the Punta Chivato property, Rocha-Albertsen was responsible for the following legal work:

> 1.   reviewing any documentation that had to do with the trusts for the property,
>
> 2.   reviewing any documentation regarding the title search of the property at the public registry office
>
> 3.   reviewing the subsequent modification to the special law that allowed for the selling of the property to Lyddon

105. Rocha-Albertsen did legal research to ensure that Lyddon did not lose the Punta Chivato property as a result of a subsequent change in the law relating to the property.  Lyddon was previously renting the Punta Chivato property because Lyddon could not own it.  The Mexican law changed to allow the sale of the property to Lyddon.

106. Rocha-Albertsen was successful in transferring the Punta chivato property into Lyddon's name, so that Lyddon's name appears as owner in the public registry.

107. This testimony conflicts with the following Lyddon testimony that:

**16**

a. Rocha-Albertsen's only role in the Punta Chivato property matter was to read the files to Frederickson so that Frederickson wold know that he had not missed anything and that he understood it.

b. Rocha-Albertsen worked an estimated two to three months on matters relating to the Punta Chivato property.

**B.   THE ANA BERTHA MATTER**

108.   Ana Bertha owned real property next to John Lyddon in Cabo San Lucas.

109.   A small portion of Ana Bertha's real property intersected Lyddon's land.

110.   Ana Bertha had erected a swimming pool on her real property.   Ana Bertha's swimming pool included a swim up bar.

111.   Part of the swim-up bar used an area of Lyddon's property.

112.   Ultimately litigation ensued between Lyddon and Ana Bertha over their respective adjoining properties.   No evidence established when the lawsuit commenced.

113.   Rocha-Albertsen took over as Lyddon's attorney in the Mexico litigation between Ana Bertha and Lyddon.

114.   Rocha-Albertsen worked on this matter from the time that he was hired by Lyddon.

115.   There were a number of civil and criminal complaints filed on both sides. Rocha-Albertsen also worked on the matter in which Ana Bertha sought a declaration that Lyddon was a "persona non grata."

**17**

116.   Rocha-Albertsen and another attorney, Luis De La Torre, prevented this from happening.  The matter involved three trips by Rocha-Albertsen to meet with government officials in Mexico City.

117.   In relation to this ongoing litigation, Rocha-Albertsen went to federal court on Lyddon's behalf because Ana Bertha filed a criminal complaint against Lyddon.  She also got a protective order against Lyddon from the 7th Federal District Court in Tijuana, Mexico.

118.   Rocha-Albertsen worked on the 7th District Court matter for about six months.

### C.   THE FEDERAL ZONE

119.   Lyddon engaged in litigation in Mexico involving a stretch of beach adjacent to his property that was part of a federal zone owned by the Mexican government.

120.   The federal zone matter is part of the dispossession lawsuit filed by Ana Bertha against Lyddon.  The dispossession lawsuit was in a separate venue from the federal zone matter. The dispossession lawsuit took place in a court and the federal zone matter was pursued in a federal Mexican administrative agency that had jurisdiction over the beaches.

121.   Ana Bertha, a Mexican citizen and Lyddon, an American citizen were in a dispute over who had the right to possess that stretch of beach.

122.   The federal zone allowed Lyddon access to the last free beach in Cabo San Lucas.  The permit gave Lyddon personal use of the beach and Lyddon held the permit as a beneficiary of the trust to which the permit was issued.

**18**

123.   The permit was not for commercial use.

124.   Rocha-Albertsen worked on obtaining the permits for Lyddon.

125.   Rocha-Albertsen made about eight to ten trips to Mexico City in relation to the federal zone issue alone, to meet with government agencies concerning this issue.  He also made about 15 trips to La Paz concerning the federal zone to meet with government agencies there as well.

126.   Rocha-Albertsen also worked briefly on an a matter concerning a dispute over the federal zone with the owner of the Hotel Hacienda adjacent to Lyddon's property.  Rocha worked on this matter during the first ten days at the beginning of his attorney client relationship with Lyddon.  His work only involved providing legal opinions and advice.

127.   Mr. Digino, initially held the right to the federal zone property.  He had leased the business that became known as Sunrise Charlie's that occupied all of the area, including the portion of the federal zone.

128.   Lyddon obtained from the federal government that portion of the federal zone that had been taken over by Sunrise Charlie's.  Then Lyddon lost the property again.  Lyddon acquired Mr. Digino's rights against Ana Bertha Sandoval for leasing property and sought to establish that she did not hold title to possessory rights for that portion of the federal zone that had been returned.

129.   Rocha-Albertsen worked with the attorneys for Mr. Digino.  Mr. Frederickson and Lyddon did not learn that the matter was resolved until the Summer of 2003 when the Canadians

**19**

came to them at some time later and told Lyddon that they had
paid Rocha-Albertsen $40,000 to obtaining rights to the federal
zone property.

130.   By the time Lyddon learned of the $40,000 payment, he
was involved in a lawsuit and did not pursue the matter because
Cuellar-Abundiz was trying to collect on the Note and Rocha-
Albertsen would not return Lyddon's calls.

131.   Lyddon has not made a claim for the $40,000 payment in
this lawsuit.

132.   Rocha-Albertsen did not disclose his dealings with and
payment from the Canadians to Lyddon.   The evidence did not
establish whether this was a breach of fiduciary duty and
conversion as it is not possible to determine if Rocha-Albertson
still acted as an attorney for Lyddon or if Lyddon owned the
"rights" that were sold to the Canadians.

133.   Rocha-Albertsen claims to have worked on the issue
related to Lyddon's disputes with Ana Bertha almost every day,
two hours daily for four years, sometimes 24 hours a day.

134.   Rocha-Albertsen provided no time records or other
reliable record of the time he spent performing legal services
for Lyddon.

**D.   CRIMINAL CHARGES INVOLVING THE ENDANGERED SPECIES
SMUGGLING**

135.   Lyddon was accused of smuggling tropical birds which
were protected under Mexican law.

136.   Rocha-Albertsen negotiated the matter to avoid
ultimate criminal liability for Lyddon.
//

**20**

1      **E.    THE JAIME BERGER MATTER**

2      137.   Jaime Berger ("Berger") is an attorney in Baja

3 California, MX.

4      138.   Berger initially represented Lyddon in the litigation

5 against Ana Bertha.

6      139.   Berger also represented Lyddon in a matter involving

7 the purchase of another small piece of Mexican real property.

8 Lyddon's attorney client relationship with Berger eventually

9 terminated.

10     140.   A dispute ensued between Lyddon and Berger over monies

11 and attorneys fees claimed by Berger to be owed by Lyddon.

12     141.   Berger filed suit against Lyddon for unpaid attorneys

13 fees in Mexico and the United States.

14     142.   Berger's United States lawsuit was filed in California

15 State Court.

16     143.   Rocha-Albertsen worked on the Berger case in San Diego

17 on Lyddon's behalf.

18     144.   The litigation lasted approximately six months.

19     145.   The case was pending in the Chula Vista courthouse of

20 the San Diego County.

21     146.   The case ended in a settlement agreement between the

22 parties.

23      **F.    ROCHA-ALBERTSEN'S MISCELLANEOUS LEGAL DUTIES**

24     147.   Rocha-Albertsen arranged the issuance and renewal of

25 FM3's for Lyddon and his assistant, Clyde Fredrickson.  FM3's are

26 permits to return to Mexico.

27     148.   Rocha-Albertsen worked on the case of Hector Gonzales.

28 Hector Gonzales was Lyddon's attorney at one point during the

**21**

1   pending lawsuit in Berger v. Lyddon in Mexico.

2       149.  From 1998 to 2000 Lyddon hired the following

3   attorneys;

4           1.   Baker & McKenzie

5           2.   Luis De La Torre, Mexico City, MX.

6           3.   Ramon Robles, Cabo San Lucas, MX.

7           4.   Eric Hoffman, Cabo San Lucas, MX.

8           5.   Paul Tovar.

9           6.   Ricardo Zavala Valdez.

10          7.   Hector Gonzalez.

11      150.  Rocha-Albertsen worked on disputes between these

12  attorneys and Lyddon.

13      151.  Rocha-Albertsen worked on the matter involving Ricardo

14  Zavala Valdes, for approximately two or three months.

15      152.  Rocha-Albertsen later testified that he spent only

16  about three weeks on the Zavala Valdez matter.

17      153.  Rocha-Albertsen worked two or three weeks maximum on

18  the Hector Gonzalez case.

19      154.  Rocha-Albertsen  worked 6 months from start to finish

20  on the Paul Tovar case.

21      155.  Rocha-Albertsen worked on the Erik Kaufman case for

22  about three weeks.

23      156.  Rocha-Albertsen's work on some of these cases were

24  simultaneous throughout the four year period.

25      157.  The Cabo Canamex matter had to do with the acquisition

26  of the beach property, the same property related to the

27  promissory note to Rocha-Albertsen.  Rocha-Albertsen worked on

28  the matter for about eight months.

**22**

1   158.  The Cabo Trust with Bancomer held title to Lyddon's

2   beach front property and allowed Lyddon to be the holder and

3   possessor of the Mexico real properties in Cabo San Lucas.

4   159.  Lyddon had three trusts in Mexico.  Rocha-Albertsen

5   worked on all three of the trusts.

6   160.  There were other trusts relating to the Punta Chivato

7   property that Rocha-Albertsen was in charge of registering. He

8   worked on these trusts about ten days. Lyddon was satisfied with

9   the legal services.

10   161.  Rocha-Albertsen was also responsible for convincing

11   the municipal authorities that the taxes to be paid as a result

12   of the sale of the Cabo property were too high.  He worked

13   several hours on this.  Rocha-Albertsen was successful in

14   reducing the tax.  He had to fight against the tax because the

15   tax changed every year and Rocha-Albertsen was successful in

16   getting the tax reduced every year.

17   162.  Rocha-Albertsen also assisted in litigation between

18   Lyddon and Bancomer, a bank in Mexico City.  This litigation was

19   commenced by Jaime Berger for Lyddon, then taken over by Paul

20   Tovar, then taken over by Rocha-Albertsen.  Lyddon sued the bank.

21   The case was dismissed.  Rocha-Albertsen entered the case after

22   final judgment.  Rocha-Albertsen worked on this case for

23   approximately ten days and made a trip to Mexico City with Lyddon

24   exclusively for this matter.

25   163.  The third time Rocha-Albertsen was in federal court in

26   relation to a criminal complaint against Lyddon was in 1999,

27   regarding a conflict over part of the land Lyddon owned in Cabo

28   San Lucas.  Rocha-Albertsen went to court and filed papers in

**23**

this matter.  He worked on this specific matter 15 to 20 days.
This was in 1999.

164.  Rocha-Albertsen obtained two protective orders in
1999.

165.  These orders had to be reissued in 2000. Rocha-
Albertsen had to convince the judge again in 2000 to reissue
them.

166.  Erik Kaufman's fees were paid.

167.  Paul Tovar was employed at Mr. Berger's office.  The
understanding was that Tovar billed his fees through Berger and
he was always paid.

168.  No significant sums were due to Berger for lack of
payment by Lyddon.

**IX.   SEPTEMBER 24, 2002: THE SIGNING OF THE PROMISSORY NOTE**

169.  Lyddon went into Rocha-Albertsen's law office on
September 24, 2002, to sign documents relating to the sale of his
Cabo San Lucas property.  Lyddon had to sign several documents on
that day.

170.  Prior to the signing of September 24th, Lyddon and
Rocha-Albertsen had an already established practice for signing
documents.

171.  Any documents that Lyddon had to sign, were normally
signed around a conference table in front of Rocha-Albertsen's
desk.

172.  On September 24, 2002 when Lyddon signed the
documents, he was accompanied by Clyde Frederickson at Rocha-
Albertsen's office.

173.  Clyde Frederickson also signed documents that same day

**24**

1  in Rocha-Albertsen's office.   The signature block was usually in
2  the center of the page below both the English and the Spanish
3  versions on the page of any document Lyddon signed.

4       174.   Rocha-Albertsen did not discuss the contents of any
5  documents with Lyddon on the 24th.

6       175.   Rocha-Albertsen never discussed with Lyddon the issue
7  of compensation for legal services at the rate of 10% for
8  facilitating the sale of the Cabo San Lucas property to the
9  Canadians.

10      176.   Rocha-Albertsen never requested that Lyddon sign a
11 document promising to pay 10% to Rocha-Albertsen for legal work
12 received from the sale of Lyddon's Cabo San Lucas property to the
13 Canadians.

14      177.   Rocha-Albertsen never told Lyddon or Frederickson
15 before or at the time, that one of the documents Lyddon signed on
16 September 24 was a $500,000 promissory note.

17 **X.     THE PROMISSORY NOTE**

18      178.   It is the duty of a Mexican attorney who is
19 representing a client in the purchase and sale of real property,
20 where the attorney is to be compensated by an amount of 10% of
21 the purchase price, to accurately state in the attorney's
22 compensation agreement with the client, the amount of the
23 purchase price and the amount of compensation.

24      179.   Rocha-Albertsen had no written compensation agreement
25 with Lyddon that pertained to the Cabo real property.

26      180.   In Mexico, when an endorsee (Cuellar-Abundiz) sues on
27 a promissory note, the maker of the note, who is the promissor
28 (Lyddon), can assert defenses against the endorsee of which the

**25**

endorsee has knowledge.

181.   Rocha-Albertsen prepared the $500,000 promissory note. The note was dated September 24, 2002.

182.   Lyddon's signature is on the note.

183.   Without Lyddon's knowledgeRocha-Albertsen included a promissory note for Lyddon to sign, with a face amount of $500,000.00, among the other papers related to the Cabo San Lucas real estate transaction that Lyddon was to sign at Rocha-Albertsen's law office on September 24, 2002.

184.   Rocha-Albertsen intentionally omitted to disclose material facts by failing to explain the terms of the promissory note to his client, Lyddon on or before September 24, 2002.

185.   The purchase price for the Cabo real property was incorrectly stated on the face of the promissory note as $5 million, rather than $2.8 million.

186.   Rocha-Albertsen violated Mexican law and committed fraud against Lyddon by claiming 10% of a falsely stated $5 million purchase price in the amount of $500,000.

187.   Rocha-Albertsen at all times knew that the sale price of the Cabo real property was $2,800,000.

188.   The maximum amount under Mexican law, that could have been claimed for attorneys fees was $280,000, if there had been an agreement, for 10% compensation, which there was not.

189.   Interest on the promissory note accrues at 1.5% per month if not paid by the date on the note.  No interest is due or collectible as the promissory note is void and unenforceable.

190.   Rocha-Albertsen, who was responsible for preparation of the promissory note, never disclosed the correct sales price

**26**

of $2.8 million on the promissory note

191.  The promissory note is both in English and in Spanish.

192.  Lyddon was not given the promissory note to read, with advice that the document was a $500,000 promissory note.

193.  The note was made payable on February 2, 2003.

194.  Rocha-Albertsen did not inform Lyddon of the due date stated on the promissory note.

195.  On September 24, 2002 when Lyddon signed the promissory note he had come into Rocha-Albertsen's office expecting to sign other documents relating to the sale of Cabo real property.

196.  The note was never separately identified or explained to Lyddon.

197.  Lyddon never had knowledge of nor intent to sign the $500,000 promissory note.

198.  Rocha-Albertsen never told anyone, not even Norma Perez, that Lyddon was going to sign a $500,000 promissory note.

197.  Lyddon did not then owe and has never owed Rocha-Albertsen the sum of $500,000.

199.  Lyddon did not ask Rocha-Albertsen to prepare the promissory note.

200.  Rocha-Albertsen did not tell Lyddon that Rocha-Albertsen prepared the promissory nor that the promissory note was for Lyddon's signature.

201.  At the time Lyddon signed the documents, with which the promissory note was included, Rocha-Albertsen did not tell Lyddon that the note was among the documents to be signed.

202.  Rocha-Albertsen did not explain any of the other

**27**

documents before Lyddon signed them.

203.   Rocha-Albertsen's fraud was in the execution because it prevented Lyddon from knowing the nature of, the amount, or terms of the promissory note and kept Lyddon from knowing about the obligation or referring it to Frederickson for review and approval before signing.

204.   Rocha-Albertsen did not see Lyddon sign the documents that included the promissory note.

205.   Lyddon was not in Rocha-Albertsen's presence when he signed the documents that included the promissory note.

206.   At the time that Lyddon signed the promissory note, Rocha-Albertsen owed Cuellar-Abundiz money for unpaid legal services performed by Cuellar-Abundiz for Rocha-Albertsen.

207.   Rocha-Albertsen transferred the signed promissory note to Cuellar-Abundiz on November 12, 2002.

208.   Rocha-Albertsen never made any direct attempt to himself enforce the signed promissory note against Lyddon.

209.   By the time the promissory note was enforced by Cuellar-Abundiz against Lyddon, the debt was over a million dollars, counting accrued interest.

210.   Promissory notes are typed on different colored paper. The validity of a promissory note in Mexico has nothing to do with the color of the paper.

211.   Frederickson did not know that Lyddon ever agreed to sign a $500,000 promissory note naming Rocha-Albertsen as promissee.

212.   Based on a long history of custom and practice in their business dealings, the promissory note for $500,000 is

**28**

1   something that Frederickson would have absolutely known about and
2   would have approved before Lyddon signed it.

3       213.   There was no consideration for a $500,000 promissory
4   note from Lyddon to Rocha-Albertsen, as Rocha-Albertsen had
5   already been paid on an ongoing basis for the legal services he
6   provided Lyddon, including sale of the Cabo real property.

7   **XI.   ROCHA-ALBERTSEN'S PRIOR DEALINGS WITH CUELLAR-ABUNDIZ**

8       214.   Rocha-Albertsen was the owner of an unsuccessful
9   restaurant business in the late 1990s.

10      215.   Eventually Rocha-Albertsen came to have problems with
11  unpaid creditors as a result of his failed business.

12      216.   Rocha-Albertsen and Cuellar-Abundiz were acquaintances
13  who had gone to the same law school together and Cuellar-Abundiz
14  stopped by Rocha-Albertsen's restaurant on occasion.

15      217.   Rocha-Albertsen sought Cuellar-Abundiz's legal
16  services to assist him with his failed restaurant and his
17  problems with creditors.

18      218.   Cuellar-Abundiz provided Rocha-Albertsen with legal
19  services with the knowledge there was a chance Rocha-Albertsen
20  might not pay.

21      219.   Cuellar-Abundiz assisted Rocha-Albertsen in a legal
22  project involving Banca Promex.  Rocha-Albertsen owed Cuellar-
23  Abundiz an unpaid balance for attorneys fees as a result of the
24  failed restaurant.  Cuellar-Abundiz represented Rocha-Albertsen
25  in the restaurant matter and obtained a release liability for
26  Rocha-Albertsen.

27      220.   Rocha-Albertsen owed money to Cuellar-Abundiz for
28  legal services performed, over $100,000.

**29**

1    221.  Rocha-Albertsen's restaurant went bankrupt in 2000.
2  Cuellar-Abundiz had periodic contact with Rocha-Albertsen's
3  restaurant as it was located a few blocks from Cuellar-Abundiz's
4  home.

5    222.  From 2000 to 2002, Cuellar-Abundiz discussed
6  collecting the over $100,000 debt owed by Rocha-Albertsen,
7  approximately ten to fifteen times, and personally called Rocha-
8  Albertsen on the phone about the debt.

9    223.  Cuellar-Abundiz had people in his office, who were
10 responsible for collecting unpaid fees, call Rocha-Albertsen on a
11 number of occasions, to no avail.

12   224.  By October 22, 2002, Rocha-Albertsen owed Cuellar-
13 Abundiz over $100,000 for unpaid attorneys fees.

14   225.  Cuellar-Abundiz continued to send invoices to Rocha-
15 Albertsen but Rocha-Albertsen told Cuellar-Abundiz he could not
16 pay.

17   226.  Even though it had been four years, Cuellar-Abundiz
18 hoped that he would eventually get paid.

19   227.  As of September 2002 Cuellar-Abundiz was not pressing
20 Rocha-Albertsen to pay him.  Other than sending regular invoices,
21 Cuellar-Abundiz did not make a demand on Rocha-Albertsen for
22 payment at that time.

23   228.  Cuellar-Abundiz has never initiated a lawsuit against
24 Rocha-Albertsen for the unpaid fees.

25   229.  Cuellar-Abundiz has since forestalled collection on
26 the over $100,000 he is owed by Rocha-Albertsen, because he
27 negotiated a deal with Rocha-Albertsen to accept the Lyddon
28 promissory note as payment.

**30**

230.   The debt from Rocha-Albertsen gave Cuellar-Abundiz a motive to agree with Rocha-Albertsen to wrongfully prosecute enforcement of the Lyddon note.

**XII.   THE PROMISSORY NOTE TRANSFER AGREEMENT**

231.   Rocha-Albertsen transferred the $500,000 signed promissory note to Cuellar-Abundiz in November 2002.

232.   At the time Rocha-Albertsen transferred the note, he was in dire financial straits and owed money, over $100,000, to Cuellar-Abundiz.

233.   Rocha-Albertsen had previously received attorneys fees bills from Cuellar-Abundiz for legal work for Rocha-Albertsen on business and credit problems.   Rocha-Albertsen never paid them.

234.   One bill was for $11,000.   Additional bills were incurred by Rocha-Albertsen for legal work by Cuellar-Abundiz for direct legal services and on some matters where Rocha-Albertsen sought assistance from Cuellar-Abundiz on matters concerning Rocha-Albertsen's clients.

235.   In November 2002, Rocha-Albertsen went to Cuellar-Abundiz's office to verify that the $500,000 note was a legally enforceable document.   Cuellar-Abundiz reviewed the note and believed that it met all of the requirements of the law.

236.   This is suspicious, because Rocha-Albertsen should have had no reason to question the validity of the note he prepared if Lyddon knowingly and voluntarily signed the note and acknowledged the debt by signing.

237.   During this meeting Cuellar-Abundiz asked Rocha-Albertsen the basis for the amount of the obligation of $500,000 from Lyddon.

238.   Cuellar-Abundiz testified that Rocha-Albertsen told Cuellar-Abundiz that the amount was to cover a final settlement of legal fees owed to Rocha-Albertsen by Lyddon.   Final settlement in Mexico means that the attorney client relationship or representation is ended and it is settled as to any amount to which each party is entitled.

239.   Before showing up at Cuellar-Abundiz's office to show him the promissory note and to verify it, Rocha-Albertsen had not mentioned anything to Cuellar-Abundiz about the possibility of making a large payment on Rocha-Albertsen's debt.

240.   The 10% legal requirement under the Schedule of Fees for the State of Baja, California applies when there is no written or oral contract between the attorney and the client.

241.   Parties are free to negotiate their own terms of a contingency fee arrangement if they choose to do so.

242.   Rocha-Albertsen and Cuellar-Abundiz entered into a contingency fee arrangement in which Rocha-Albertsen assigned Lyddon's note to Cuellar-Abundiz, who would seek enforcement of the note.

243.   Rocha-Albertsen and Cuellar-Abundiz agreed that they would split the note proceeds upon collection, with 50% payable to Cuellar-Abundiz directly and from the other 50%, Rocha-Albertsen would satisfy his debt to Cuellar-Abundiz and the remaining balance would go to Rocha-Albertsen.

244.   The contingency fee arrangement between Rocha-Albertsen and Cuellar-Abundiz was an oral agreement.

245.   Cuellar-Abundiz is the current owner and holder of the note.

**32**

246. When Cuellar-Abundiz took the note, he had knowledge that it was owed by Lyddon, his former client.

247. Cuellar-Abundiz should have contacted Lyddon to inquire about the validity of the note and if Lyddon would voluntarily pay it.

**XIII.   ROCHA-ALBERTSEN'S SCHEDULING CALENDAR**

248. Cuellar-Abundiz's name was scheduled in Rocha-Albertsen's calendar for the date of September 24, 2002, the same day the disputed promissory note was signed.

249. Cuellar-Abundiz's name appears in Rocha-Albertsen's calendar twice on September 24, 2002.

250. To designate scheduled calls, Rocha-Albertsen writes down the person's name to be called in his planner and puts a small circle next to that person's name.

251. Cuellar-Abundiz's name had a small circle next to his name on Rocha-Albertsen's calendar for September 24, 2002.

252. Rocha-Albertsen called Cuellar-Abundiz twice on September 24, 2002.

253. This is circumstantial evidence that Rocha-Albertsen sought Cuellar-Abundiz's assistance in preparing the promissory note.

**XIV. CUELLAR-ABUNDIZ'S SCHEDULING CALENDAR**

254. Cuellar-Abundiz did not have Rocha-Albertsen scheduled in his planner on the date of September 24, 2002.

255. There is no reference in Cuellar-Abundiz's office desk calendar to Attorney Rocha-Albertsen on September 24, 2002.

256. Cuellar-Abundiz denied participating in preparation of the promissory note.

**33**

257.   The evidence does not preponderate that Cuellar-Abundiz directly participated in the fraudulent obtaining of the $500,000 promissory note from Lyddon on September 24, 2002.

258.   The circumstances under which Rocha-Albertsen presented the promissory note to Cuellar-Abundiz were highly suspicious in that a consensual acknowledgment of a valid and subsisting debt by an attorney-creditor who prepared the note should not have required an advisory opinion from another attorney as to its enforceability.

259.   The face amount of the note, $500,000, was so high that the amount should have put Cuellar-Abundiz on immediate notice as to whether the note represented a valid and enforceable obligation.

260.   The note, which purports to be for 10% of the sale price of property, should have caused Cuellar-Abundiz to inquire about the underlying sale price which was illegally overstated.

261.   The contingency arrangement is also highly suspect. Cuellar-Abundiz was to receive $250,000 plus accrued interest or 50% of the amount of the proceeds he collected off the top; then, the entire amount of the debt owed by Cuellar-Abundiz to him, well over $100,000, with any balance remaining payable to Rocha-Albertsen.

262.   Cuellar-Abundiz knew that Rocha-Albertsen was in desperate financial straits; that Rocha-Albertsen did not have money; was unable to pay his debts; and that Rocha-Albertsen's attorney-client relationship with Lyddon had ended.

263.   Because Cuellar-Abundiz had maintained a satisfactory attorney-client relationship with Lyddon and had been paid in

**34**

full by Lyddon, there was no reason for Cuellar-Abundiz, a former attorney who was then not on adverse terms with Lyddon, a former client, not to contact Lyddon to inquire about the circumstances and validity of the promissory note.

264.   Instead, Cuellar-Abundiz made a highly financially advantageous agreement with Rocha-Albertsen to totally disadvantage Lyddon and set up a plan to trick Lyddon into being served with Cuellar-Abundiz's lawsuit.

265.   By simple inquiry of Lyddon, Cuellar-Abundiz would have learned that the Note was fraudulently procured and illegal as to its amount.

266.   The agreement between Rocha-Albertsen and Cuellar-Abundiz was to wrongfully enforce an illegal, void, and fraudulent promissory note, which Cuellar-Abundiz knew or should have known.

**XV.   THE CUELLAR-ABUNDIZ PROMISSORY NOTE ENFORCEMENT SUIT**

267.   In early 2003, Lyddon initiated a phone call to Rocha-Albertsen and made an appointment to pick up his legal files from Rocha-Albertsen on February 18, 2003, as Lyddon was changing lawyers.

268.   Rocha-Albertsen and Lyddon mutually agreed that Lyddon pick up his legal files.

269.   Three weeks prior, Lyddon had made an appointment with Rocha-Albertsen to pick up the files.  When Lyddon got to the Mexican border he called Rocha-Albertsen's office and told Rocha-Albertsen that he was about to cross the border.  Rocha-Albertsen told Lyddon that an emergency had arisen which required that Rocha-Albertsen leave immediately to go to Ensenada.

1  270.  Cuellar-Abundiz talked to Rocha-Albertsen prior to
2  serving Lyddon with the enforcement lawsuit.

3  271.  Rocha-Albertsen told Cuellar-Abundiz that Lyddon would
4  be outside his office on February 18, 2003, in Tijuana, MX.

5  272.  Lyddon was first served with the Cuellar-Abundiz
6  lawsuit on February 18, 2003, outside Rocha-Albertsen's office.

7  273.  When filing a commercial action in Mexico to enforce a
8  promissory note, the defendant has five days to answer.  Even if
9  the defendant does not file an answer he can offer evidence to
10 substantiate the fact that he does not owe that money on the
11 note.

12  274.  When Lyddon arrived at Rocha-Albertsen's office on
13 February 18, 2002, the door was locked.  There was a note on the
14 door that said, "Gone for a coke.  Back in ten minutes."

15  275.  Lyddon stood outside the office for a moment and then
16 Cuellar-Abundiz approached him and told him that the door was
17 locked but they wanted to talk to him.  Also present were a
18 process server who showed Lyddon a badge and an interpreter.

19  276.  Two women took Lyddon's picture at the time of
20 service.

21  277.  Lyddon secured representation from attorneys in
22 Tijuana to defend with the Cuellar-Abundiz lawsuit.

23  278.  Lyddon's attorney informed Lyddon that the Cuellar-
24 Abundiz lawsuit was to enforce a promissory note.

25  279.  Lyddon testified that he had never seen the promissory
26 note before he was shown the note in the Cuellar-Abundiz
27 enforcement suit.

28  280.  It is not reasonable to believe that Lyddon would sign

**36**

a $500,000 promissory note to Rocha-Albertsen for legal services, because Lyddon had paid Rocha-Albertsen for legal services already.  The face amount of the note was almost double the amount permitted by law for a real estate sale.

281.  If Lyddon had ever seen the note he would not have signed it, as he and Frederickson testified.

282.  Two or three months after being served outside Rocha-Albertsen's office, Lyddon first saw the original promissory note with his original signature on it.

283.  Lyddon next saw the note when he was in the courthouse building in Tijuana.  Lyddon also got to see the lawsuit at that time.  It was in Spanish and on legal paper.  The paper the promissory note was on looked like the paper that he occasionally signed in blank form at Rocha-Albertsen's request.

284.  After leaving the court in Tijuana, Lyddon had no contact with Rocha-Albertsen until Christmas of 2003 when Rocha-Albertsen left a message on Lyddon's answering machine requesting that Lyddon return his call.

285.  Rocha-Albertsen asked Cuellar-Abundiz if he would dismiss the lawsuit, Cuellar-Abundiz told Rocha-Albertsen that he would not dismiss the lawsuit.

286. Cuellar-Abundiz lost his case in Mexico to collect the note against Lyddon. In this first enforcement action, Cuellar-Abundiz originally obtained a judgment which was vacated on appeal because Cuellar-Abundiz did not follow the procedural requirement of the court to have the promissory note translated into Spanish by a certified expert.

287.  The Mexican federal judge determined that the

**37**

1  promissory note was not properly translated, although the note is

2  stated in both Spanish and English in two different columns.

3      288.   The case was remanded for further proceedings.

4      289.   Upon retrial the parties have all the law and defenses

5  that the law permits.

6      290.   Cuellar-Abundiz did not appeal to a higher court

7  because the judge did not rule on the substantive merits of the

8  case.   The validity of the note was not determined.

9      291.   Cuellar-Abundiz intends to pursue enforcement on the

10  note.   He also has a lien on all of Lyddon's property in Mexico.

11      292.   The actual promissory note is in a safe at the

12  courthouse in Tijuana, MX.

13  **XVI.   THE DECEMBER 25, 2003 ROCHA-ALBERTSEN PHONE CALL**

14      293.   On December 25, 2003 Rocha-Albertsen called Lyddon and

15  left a message on Lyddon's machine requesting that Lyddon return

16  his phone call.

17      294.   Rocha-Albertsen also called Frederickson at home in

18  Utah and left a message that he was trying reach Lyddon.

19      295.   When Lyddon returned Rocha-Albertsen's phone call on

20  December 25, 2003, Rocha-Albertsen was very emotional.

21      296.   During this phone call, Rocha-Albertsen apologized to

22  Lyddon for having done a "bad thing."   Rocha-Albertsen also

23  stated that he wanted to meet Lyddon, Frederickson, and attorney

24  Mr. Brewer.

25      297.   Frederickson and Rocha-Albertsen also had a phone

26  conversation on December 26, 2003 for about 15 or 20 minutes

27  where Frederickson told Rocha-Albertsen that Lyddon did not owe

28  him $500,000.

**38**

**XVII.   THE MEETING AT MR. BREWER'S OFFICE**

298.   Mr. Brewer was contacted by Rocha-Albertsen in the latter part of January 2004.  He received a call notifying him that there would be a meeting with Lyddon, Rocha-Albertsen, and others and asking if they could use his offices for that meeting.

299.   Mr. Brewer was not asked to serve as any party's lawyer at the meeting.

300.   When the meeting between these parties was arranged, Mr. Brewer did not know that there was a legal dispute between Lyddon and Rocha-Albertsen.

301.   Rocha-Albertsen told Mr. Brewer that he wanted to meet with Lyddon and apologize, that he had made a terrible mistake and he wanted Mr. Brewer to attend the meeting.

302.   Mr. Brewer attended two meetings involving Rocha-Albertsen and Lyddon in 2004 in Mr. Brewer's San Diego law offices.

303.   The first meeting was held in conference room 33 A. Present were Rocha-Albertsen, Frederickson, Lyddon, Mr. Brewer.

304.   At the first meeting there were no settlement discussions in Mr. Brewer's presence.

305.   Mr. Brewer was never told by anyone before the meeting at Brewer's law office that the subject of the meetings was settlement of any dispute.

306.   By the date of these meetings there were two lawsuits pending in Mexico against Lyddon.  The first lawsuit was filed by Rocha-Albertsen for unpaid attorney's fees.  The second lawsuit was filed by Cuellar-Abundiz to enforce the promissory note.

307.   At the first meeting, there were no discussions as to

the litigation between the parties to this case.

308.   At the first meeting Rocha-Albertsen was visibly upset. He started to speak and then began to weep and was crying. He had to stop talking and compose himself.

309.   Rocha-Albertsen said on numerous occasions during the first meeting that he was very sorry for what he had done. Rocha-Albertsen said that he violated his client's trust and a friend's confidence.   These are admissions.

310.   The focus of Rocha-Albertsen's apology was about a signature on a document and the veracity of that document.

311.   During the first meeting Rocha-Albertsen stated that there would be a second meeting where he would communicate what he would do to "make amends" or what he would do to "fix the problems."

312.   The court finds that these references were to the $500,000 promissory note.

313.   Rocha-Albertsen's words and conduct evidenced a consciousness of guilt and an admission that he betrayed his friend Lyddon, by preparing and procuring Lyddons' signature on an unlawful and fraudulent promissory note.

314.   There was no statement by anybody at the San Diego meeting that the conversations or communications at the meeting were to be confidential.   Rocha-Albertsen's statements at that meeting are admissible in evidence as admissions.

315.   The San Diego meeting was not to effectuate a settlement or compromise.

316.   There were no written minutes of the San Diego meeting or any other record of the meeting as to participants or the

**40**

substance of discussions at the meeting.

317.   No one typed or wrote anything down at the two meetings.

318.   Mr. Brewer was never asked to take any role to resolve any issue raised by Rocha-Albertsen in the two meetings about Lyddon's signature on the promissory note.

319.   In a lawsuit in Mexico, Rocha-Albertsen sued Lyddon for $25,000 in unpaid legal fees.  Legal fees pertaining to "the last few months of work."  Rocha-Albertsen testified that his claim could have been for work from 2001 to 2002.  This proves that Lyddon did not owe the $500,000 for legal services not connected with the sale of the Cabo property as the date of the note, September 24, 2002, is after 2001.

320.   After the meeting with Lyddon at Mr. Brewer's office, Rocha-Albertsen dropped his lawsuit against Lyddon for attorneys fees.

321.   After the meeting Mr. Brewer did not see either Lyddon or Rocha-Albertsen until Mr. Brewer's deposition in this case in 2005.

322.   After the meeting Mr. Brewer stopped referring clients to Rocha-Albertsen.

323.   There was no settlement agreement drafted or concluded at or after the meetings at Mr. Brewer's office.

324.   The court finds Mr. Brewer to be credible and that his testimony about the 2003 meeting at his office is true.

325.   Mr. Brewer is an experienced attorney and had no

**41**

reason to lie at this trial.  He had no motive or bias to favor any party in this case.

**XVIII.    CREDIBILITY DETERMINATIONS**

326.  As a matter of credibility, Rocha-Albertsen and Cuellar-Abundiz have everything to gain, little to lose, in their pursuit of the note's enforcement.  Lyddon had everything to lose and was consistent in his denials of the existence and contents of the note.

> a.    Rocha-Albertsen was inconsistent in many of his answers.
>
> b.    Cuellar-Abundiz failed to explain why he did not contact Lyddon at the time Rocha-Albertsen brought the note to Cuellar-Abundiz in September 2002, to verify its validity and learn Lyddon's position on the payment.

327.  Lyddon has negligible motive to misrepresent the note's purpose because the true facts are that sale price of the Cabo property was $2.8 million.  The note is illegal.

328.  Lyddon could expect the note to be voided and cancelled when the true facts were ascertained.

329.  Lyddon knew he had paid Rocha-Albertsen over $120,000 in attorneys fees over four years.  No evidence of legal services by Rocha-Albertsen for unpaid legal services of $500,000 was presented, nor did Lyddon need to worry that Rocha-Albertsen

could produce evidence to justify "settlement" in September 2002 of attorneys fees owed by Lyddon of an additional $500,000.

330.   Rocha-Albertsen admitted to an impartial and highly credible witness, Mr. Brewer, that he had wronged Lyddon through obtaining the promissory note.

## CONCLUSIONS OF LAW

### I.   SUBJECT MATTER JURISDICTION

1.   The district courts have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states and in which citizens of a foreign state are additional parties.   28 U.S.C. §1332(a)(3) (2006).

2.   This dispute is between Plaintiff Lyddon, a citizen of the State of California, and Defendants Rocha-Albertsen and Cuellar-Abundiz, both citizens of Mexico.

3.   It is undisputed that the amount in controversy exceeds the value of $75,000, exclusive of interests and costs.

### II.   PERSONAL JURISDICTION

#### A.   DEFENDANTS' CONSENT TO PERSONAL JURISDICTION

4.   Personal jurisdiction recognizes and protects an individual liberty interest and can, like other such rights, be waived. *Dow Chem. Co. v. Calderon,* 422 F.3d 827, 831 (9th Cir. 2005).

**43**

5.  A defendant submits to the court's jurisdiction either by expressly consenting thereto or by failing to raise the defense of lack of jurisdiction in its initial motion or responsive pleading.  Fed. R. Civ. P. 12(h)(1); *Schnabel v. Lui*, 302 F.3d 1023, 1033 (9th Cir. 2002).  Both Defendants objected to personal jurisdiction in the Eastern District of California.

6.  A non resident who appears in an action without raising lack of personal jurisdiction is deemed to consent to the court's jurisdiction.  Schwarzer, Tashima, & Wagstaffe, CAL. PRAC. GUIDE: FED. CIV. PRO. BEFORE TRIAL ¶ 3:64.1 (The Rutter Group 2006).

7.  The evidence establishes that defendant Rocha-Albertsen actively solicited legal business in California, that he had a California telephone number, that he sought referrals from a California lawyer based in San Diego, CA, had meetings with his client, Lyddon, in San Diego, CA and communicated with Lyddon in California about Lyddon's business matters that concerned Mexican real property and activities Lyddon engaged in both in California and Mexico.

8.  Rocha-Albertsen established more than minimum contacts with California and communicated to Lyddon at Lyddon's Bakersfield (California) office.  He was paid from Lyddon's Bakersfield office.  He had many business meetings in California with Frederickson on Lyddon's business matters.  Systematic and continuous contacts in the 1999-2001 period by Rocha-Albertsen

with California and Lyddon affecting the Eastern District of California are present to justify the assertion of personal jurisdiction over Rocha-Albertsen in this District.

9.   The court has personal jurisdiction over Rocha-Albertsen in this action.

### B.   JURISDICTION BASED ON DEFENDANTS' MINIMUM CONTACTS IN CALIFORNIA

10.   Where, as here, there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits. *See,* Fed. R. Civ. P. 4(k)(1)(A); *Yahoo! Inc. v. La Ligue Contre Le Racisme,* 433 F.3d 1199, 1205 (9th Cir. 2006).

11.   In California, a court may exercise jurisdiction on any basis not inconsistent with the Constitution of the state or of the United States.  Cal. Code Civ. P. § 410.10; *Tuazon v. R.J. Reynolds Tobacco Co.,* 433 F.3d 1163, 1168 (9th Cir. 2006) (exercise of *in personam* jurisdiction over an out of state defendant is limited by the Due Process Clause of the Fourteenth Amendment.)

12.   Because California's long arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same. *Yahoo! Inc.,* 433 F.3d at 1205.

13.   For a court to exercise personal jurisdiction over a

**45**

non resident defendant, that defendant must have at least minimum contacts with the relevant forum such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *Schwarzenegger*, 374 F.3d at 801; *see also, International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945).

14.   There are two kinds of jurisdiction a court can exercise over a non resident defendant: general jurisdiction and specific jurisdiction.

### C.   GENERAL JURISDICTION

15.   For general jurisdiction to exist over a non resident defendant, the defendant must engage in continuous and systematic general business contacts that approximate physical presence within the state. *Schwarzenegger*, 374 F.3d at 801.  This is an exacting standard because a finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world. *Id.; Brayton Purcell LLP v. Recordon & Recordon,* 361 F. Supp. 2d 1135, 1139 (N.D. Cal. 2005); *See also, International Shoe Co. v. Washington,* 326 U.S. 310, 318 (1945)("While it has been held that continuous activities of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity, there have been instances in which the continuous... operations within a state were thought so substantial and of such a nature as to justify suit against it on

**46**

causes of action arising from dealings entirely distinct from those activities.")

16.   In applying general jurisdiction, "factors to be taken into consideration are whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there."  *Brayton Purcell LLP,* 361 F. Supp. at 1139 (*quoting, Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,* 223 F.3d 1082, 1086 (9th Cir. 2000).)

17.   Rocha-Albertsen intentionally solicited Lyddon's legal business, knowing that Lyddon was a California resident and would conduct some of Lyddon's business.

18.   Rocha-Albertsen met with Lyddon and Frederickson in California numerous times, on both business and personal matters related to the legal services he performed for Lyddon and Lyddon's business.

19.   Rocha-Albertsen communicated with Lyddon and Frederickson in California in the Eastern and Southern Districts.

20.   Rocha-Albertsen advertised for business in California, met with a number of other clients in San Diego at Mr. Brewer's law office, and accepted referrals of U.S. clients from Mr. Brewer, for legal work to be performed in Mexico.

//

**47**

### D.   **SPECIFIC JURISDICTION**

21.   Specific jurisdiction is analyzed under a three prong test:

> 1.   The non resident defendant must purposefully direct activities or consummate some transaction with the forum or resident thereof; or perform some act which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protection of its laws;
>
> 2.   the claim must be one which arises out of or relates to the defendant's forum related activities; and
>
> 3.   the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger,* 374 F.3d at 802.; *Brayton Purcell LLP,* 361 F. Supp. 2d at 1140.

22.   Though the Ninth Circuit formerly required a plaintiff to demonstrate each of these factors to establish specific jurisdiction, now jurisdiction may be established with a lesser showing of minium contacts if considerations of reasonableness dictate. *Ochoa v. J.B. Martin & Sons Farms,* 287 F.3d 1182, 1189 (9th Cir. 2002).   Under this analysis, there will be cases in which the defendant has not purposefully directed its activities at the forum state, but has created sufficient contacts to allow the state to exercise personal jurisdiction if such exercise is sufficiently reasonable.   *Id.*

**48**

23.   Although Cuellar-Abundiz did not intend to himself perform acts in the United States and the Eastern District of California, his enforcement agreement with Rocha-Albertsen to carry out a wrongful scheme to enforce a fraudulent and illegal note has consequences that Cuellar-Abundiz intended and were foreseeable to cause harm to Lyddon with the State and Eastern District of California.

24.   The Court has by virtue of Cuellar-Abundiz's knowing and intentional conduct to do injury and harm to Lyddon at the situs of Lyddon's business and residence in the Eastern District of California, sufficiently acted to directly cause such harm and damage to Lyddon to provide a reasonable basis for jurisdiction that comports with conventional standards of fair play and substantial justice.

### E.   ROCHA-ALBERTSEN'S PURPOSEFUL AVAILMENT

25.   Under the first prong of the three part specific jurisdiction test, Lyddon has established that Rocha-Albertsen purposefully availed himself of the privilege of conducting activities in California, and Rocha-Albertsen purposefully directed his activities toward California to obtain and maintain Lyddon and other clients and to perform legal services for which he would be compensated.  *Schwarzenegger,* 374 F.3d at 802.   A purposeful availment analysis applies to suits sounding in contract.  *Id.*

49

26.   Although Cuellar-Abundiz had a post office box and U.S. clients, he did not solicit Lyddon's business in California and did not otherwise seek to perform legal services for Lyddon in California.  All legal work Cuellar-Abundiz performed for U.S. clients was in Mexico.

27.   Cuellar-Abundiz's maintenance of postal boxes and telephone service in California was to aid the efficiency of his business in Mexico.

28.   Personal jurisdiction exists over Cuellar-Abundiz based on his tortious acts and conspiratorial acts "purposefully directed" towards Lyddon in Bakersfield, California.  These consisted of:

        a.   wrongful agreement with Rocha-Albertsen to enforce a fraudulent and illegal note against Lyddon;

        b.   knowing enforcement of the fraudulent and illegal note against Lyddon;

        c.   performance of overt acts against Lyddon by serving him and by seeking to sequester Mexican property which would have adverse consequences to Lyddon at his Bakersfield headquarters office.

29.   Neither Rocha-Albertsen or Cuellar-Abundiz were licensed to practice law in California.

30.   Rocha-Albertsen was previously employed by a U.S. law firm, Baker and McKenzie.  Rocha-Albertsen worked in Tijuana, MX

for Baker and McKenzie and worked on Lyddon matters while Lyddon was a client of that law firm.

31.   A showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's affirmative actions in the forum.  *Schwarzenegger,* 374 F.3d at 802*; See also, Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.,* 328 F.3d 1122, 1130 (9th Cir. 2003).  By taking such actions, a defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.  *Schwarzenegger,* 374 F.3d at 802.  In return for these benefits and protections a defendant must submit to the burdens of litigation in that forum.  *Id.*

32.   The mere existence of a contract with a party in the forum state does not constitute sufficient minimum contacts for jurisdiction.  *Sher v. Johnson,* 911 F.2d 1357, 1362 (9th Cir. 1990).  In determining whether personal jurisdiction existed over a Defendant law firm, the Ninth Circuit looked to prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing to determine if the defendant's contacts are substantial and not merely random, fortuitous, or attenuated.  *Id.* at 1361. Accepting payment from a California bank, making phone calls, and sending letters to California as normal incidents of the

representation did not constitute a deliberate creation of a "substantial connection" to establish purposeful availment. *Id.* at 1362. Nor did these acts constitute a promotion of business within California. *Id.*

33. In *Sher* a legal malpractice claim was brought by a California resident against a Florida law firm. *Id.* at 1362. The law firm promoted legal representation of Plaintiff in Florida. *Id.* at 1362. The firm did not solicit Plaintiff's business in Florida; Plaintiff came to the firm in Florida. *Id.* There was no substantial connection with California because neither the firm nor any of its partners undertook any affirmative action to promote business with California. *Id.* Even the three trips by the firm's partner to California in connection with the representation of Plaintiff, combined with the underlying representation did not constitute purposeful availment. *Id.* at 1363. These three trips were discreet events arising out of a case centered entirely in Florida and that appeared to have been little more than a convenience to the client who would have had to otherwise travel to Florida. *Id.* Such contacts were too attenuated to create a substantial connection with California.[1] *Id.*

---

[1] However, the court ultimately held that by requiring the execution of a deed to California real estate, the partnership was looking to the laws of California to secure its right to payment under its contract with Sher. *Sher*, 911 F.2d at 1363. This contemplated significant future consequences in California

34.   *Sher* is partially applicable to Cuellar-Abundiz, who met Lyddon in Tijuana, MX based on Rocha-Albertsen's referral. Cuellar-Abundiz's legal work for Lyddon was only performed in Mexico and covered business and legal disputes in Mexico. However, jurisdiction over Cuellar-Abundiz is found through a purposeful direction analysis and through a conspiracy theory, through which Rocha-Albertsen's California purposeful availment and solicitation of California business and California minimum contacts are attributed to Cuellar-Abundiz.

35.   Deliberately creating continuing obligations to a resident of California by contracting to provide personal services is sufficient to establish purposeful availment for Rocha-Albertsen. *T.M. Hylwa, M.D., Inc. v. Palka,* 823 F.2d 310, 314 (9th Cir. 1987).  In *Palka,* Defendant Palka was hired by Plaintiff Hylwa to render accounting services for Hylwa's medical practice in Kansas.  *Id.*  Hylwa eventually discontinued his practice in Kansas and moved to California where he established a new medical practice.  *Id.*  Palka continued to provide accounting services from Kansas to Hylwa's California medical practice.  *Id.* Palka performed most of the services in Kansas but would travel to California on a regular basis over the span of two years.  *Id.*

and, combined with the firm's entire course of dealing with the Shers, including the calls, the letters, and the trips, constituted purposeful availment for purposes of jurisdiction. *Id.*

**53**

36.   The Ninth Circuit held that Palka "purposefully engaged in a business relationship with a California employer such that he should reasonably anticipate being haled into court there." *Id.* at 314. (*citing, World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  That Palka rarely came into physical contact with the forum did not defeat jurisdiction.  *Id.*  While Palka's initial contact with California was created by Hylwa's unilateral decision to move there, Palka's decision to continue serving as an accountant for Hylwa's California practice for three years arose from Palka's desire to benefit from the contractual relationship and not from Hylwa's unexpected relocation.  *Id. at* 314.  Based on his ongoing performance of accounting services for a California enterprise, including his annual business trips to California, Palka purposefully availed himself of the laws of California and should have reasonably anticipated being haled into court within the state for claims arising out of his employment.  *Id.*

37.   In *Trinity Industries, Inc. v. Myers*, 41 F.3d 229 (5th Cir. 1995), the Fifth Circuit also dealt with the issue of what constitutes purposeful availment activities in a forum state. The Fifth Circuit held that Plaintiff, who was a major client of the firm and the firm representing Plaintiff over the course of several years, regularly handling Plaintiff's legal matters, was sufficient to establish the requisite minimum contacts in the

**54**

forum state.  *Id* at 231.  The legal representation required

regular mail and telephonic communications within the forum state

and, on occasion, physical presence for meetings in the forum

state.  *Id.*  Over a three year period the firm represented

Plaintiffs within the courts of the forum state.  *Id.*  These

contacts amounted to a substantial connection within the forum

state and such contacts could not be accurately be characterized

as random, fortuitous, or incidental.  *Id.*

38.  Rocha-Albertsen regularly communicated, traveled with,

and corresponded with Lyddon in California.  Lyddon was Rocha-

Albertsen's major client in 1999-2002.

### F.   CUELLAR-ABUNDIZ'S PURPOSEFUL DIRECTION ACTIVITIES

39.  A purposeful direction analysis is most often used in

suits sounding in tort, such as fraud.  *Schwarzenegger*, 374 F.3d

at 802.

40.  A showing that a defendant purposefully directed his

conduct toward a forum state usually consists of evidence of the

defendant's actions outside the forum state that are directed at

the forum.  *Id.* at 803.  The Supreme Court has held that due

process permits the exercise of personal jurisdiction over a

defendant who "purposefully directs" his activities at residents

of a forum even in the absence of physical contacts with the

forum.  *Id.*

41.  Purposeful direction is evaluated under the three-part

*Calder* effects test traceable to the Supreme Court's decision in *Calder v. Jones*, 465 U.S.783 (1984). *Schwarzenegger*, 374 F.3d at 803. *Calder* stands for the proposition that purposeful availment is satisfied even by a defendant whose only "contact" with the forum state is the "purposeful direction" of a foreign act having effects in the forum state. *Id.*

42. Under *Calder* the effects test requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state (3) causing harm that the defendant knows is likely to be suffered in the forum state. *Id.*

43. An intentional act requires "something more" than mere foreseeability in order to justify the assertion of personal jurisdiction in California over Cuellar-Abundiz. *Id.* at 805.

44. Intentional act has specialized meaning in the context of the *Calder* effects test. *Id.* at 806.

45. The Restatement Second of Torts defines "act" as an "external manifestation of the actor's will and does not include any of its results, even the most direct, immediate, and intended. *Id.* Thus, if the actor, having pointed a pistol at another, pulls the trigger, the act is the pulling of the trigger and not the impingement of the bullet upon the other's person.

46. "Intent" is construed in the context of the "intentional act" test as referring to an "intent to perform an actual, physical act in the real world, rather than an intent to

56

accomplish a result or consequence of that act.

47.   In this case the intentional act is Cuellar-Abundiz's filing of a wrongful enforcement action in Mexico express intent against Lyddon and his business and property in Bakersfield California, and as co-conspirator with Rocha-Albertsen.  Cuellar-Abundiz initiated the enforcement action on a fraudulent and illegal promissory note against a former client whom he knew had the ability to satisfy the note, under circumstances that Cuellar-Abundiz knew or should have known by reasonable inquiry of Lyddon which he had a duty to make, would have disclosed the invalidity and illegality of the note.

48.   Cuellar-Abundiz expressly aimed his tortious acts at Lyddon, who he knew to be a resident of the Eastern District of California at Bakersfield.

49.   Cuellar-Abundiz caused harm to Lyddon, a former client, by filing the enforcement action on the false promissory note, knowing it would cause Lyddon economic harm in the Eastern District of California, by expending legal fees and resources in response to the action.

### G.   CLAIMS ARISING OUT OF DEFENDANTS' FORUM RELATED ACTIVITIES

50.   The Ninth Circuit relies on a "but for" test to determine whether a particular claim arises out of forum-related activities and thereby satisfies the second requirement for specific jurisdiction.  *Doe v. Unocal Corp.,* 248 F.3d 915, 924

(9th Cir. 2001); *Ballad v. Savage,* 65 F.3d 1495, 1500 (9th Cir. 1995).  In applying this test the issue is whether plaintiff's claims would have arisen but for defendants' contacts with California.  *Unocal Corp.,* 248 F.3d at 924.

51.  But for Rocha-Albertsen's associations with Baker and McKenzie, and Rocha-Albertsen's California relationships and presence, the attorney-client relationship with Lyddon could not have been formed or continued over the years.

### H.   REASONABLENESS

52.  The bare existence of minimum contacts is not sufficient to allow a court to exercise personal jurisdiction over a defendant.  *Unocal Corp.,* 248 F.3d at 925.  A finding that assertion of jurisdiction is reasonable is also required.  *Id*. In other words, once the court concludes that a defendant purposefully established minimum contacts with a forum state, and that the claims at issue arose from those contacts, the court must determine whether the assertion of personal jurisdiction would comport with traditional notions of fair play and substantial justice.  *Id.*  A finding of defendants' purposeful availment in the forum state raises the presumption that jurisdiction is reasonable.  *Ballad,* 65 F.3d at 1500.

53.  Defendants bear the burden of presenting a compelling case that the presence of some other considerations would render jurisdiction unreasonable.  *Id.* (citing, *Burger King v.*

*Rudzewicz,* 471 U.S. 462, 477 (1985).)   The factors relevant to this inquiry may include the following:

      1.   The extent of defendant's purposeful interjection into the forum state

      2.   The burden on the defendants

      3.   The plaintiff's interest in convenient and effective relief

      4.   The most efficient forum for judicial resolution of the dispute

      5.   The forum state's interest in adjudicating the dispute

      6.   The extent of the conflict with the sovereignty of defendant's state.

*Sher,* 911 F.2d at 1364.   Looking at these factors it must be determined whether defendants demonstrated that jurisdiction in California would be so unreasonable as to violate due process.

54.   There is no inequity or unreasonableness in bringing Rocha-Albertsen and Cuellar-Abundiz, as co-conspirators, into the Eastern District of California to defend this suit.

55.   Rocha-Albertsen communicated by phone and mail with Lyddon in Bakersfield, California where Lyddon maintained his offices.

56.   Any burden on Rocha-Albertsen is not significant since he was only required to travel to the Eastern District for trial.

57.   The most effective and efficient relief can be obtained in the Eastern District of California because the Mexican legal system requires separating the underlying case on the note and its enforcement and apparently does not recognize applicable defenses of illegality of the promissory note and fraud in the execution.

58.   The forum state, California, has a substantial interest in seeing that its resident, Lyddon, is protected from fraud, an illegal contract, and breaches of fiduciary duty by Rocha-Albertsen to his client, Lyddon.   Some of the conduct occurred in California as described above.

59.   The law of Mexico is sufficiently different from and adverse to the California resident that the forum's choice of law rules should be applied to this dispute.

**III.**       **SUPPLEMENTAL JURISDICTION**

60.   Title 28 U.S.C. section 1367(a) provides in pertinent part:

> "In any civil action of which the district courts have original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

61.   Original federal jurisdiction in this action is based on diversity of citizenship.   Lyddon's state law claims invoke supplemental jurisdiction and arise from the same case or

controversy.  California choice of law rules govern applicable substantive law.

**IV.   BREACH OF CONTRACT**

62.  It is well settled that in diversity cases federal courts must apply the choice-of-law rules of the forum state. *Darulis v. Garate,* 401 F.3d 1060, 1062 (9th Cir. 2005).

63.  Here the evidence supports the finding that Rocha-Albertsen and Lyddon intended California law to apply to their attorney-client relationship dealings as Rocha-Albertsen started working for Lyddon, a U.S. citizen, an Eastern District of California resident, while at Baker & McKenzie in Tijuana, which was affiliated with Baker & McKenzie's San Diego offices.

64.  Under California law, the elements for a claim for breach of contract are (1) the existence of a contract, (2) Plaintiff's performance or excuse for nonperformance, (3) Defendant's breach, and (4) damage to Plaintiff.  *First Commercial Mortgage Co. v. Reece*, 89 Cal. App. 4th 731, 745 (2001) (citing 4 Witkin Cal. Procedure (4th ed. 1997), at § 476, p. 570).

**A.   THE EXISTENCE OF AN ATTORNEY-CLIENT CONTRACT BETWEEN LYDDON AND ROCHA-ALBERTSEN**

65.  A contract is an agreement to do or not to do a certain thing and gives rise to an obligation or legal duty that is enforceable in an action at law.  Cal. Civ. Code §1549; *Agosta v.*

**61**

*Astor*, 120 Cal. App. 4th 596, 604 (Cal. Ct. App. 2004).

66.   Under California law, the essential elements of a contract are:

    1. Parties capable of contracting
    2. Parties mutual consent
    3. A lawful objective and
    4. A sufficient cause or consideration

Cal. Civ. Code §1550;  *Lopez v. Charles Schwab & Co., Inc.,* 118 Cal. App. 4th 1224, 1230 (Cal. Ct. App. 2004).

67.   Accompanying every contract is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and a failure to observe any of these conditions is a tort, as well as a breach of contract.  *N. Am. Chem. Co. v. Superior Court,* 59 Cal. App. 4th 764, 774 (Cal. Ct. App. 1997).  This includes the covenant of good faith and fair dealing that no party will act to deprive the other of the benefits of the contract.

68.   The rule which imposes this duty is of universal application as to all persons who by contract undertake professional or other business engagements requiring the exercise of care, skill, and knowledge; the obligation is implied by law and need not be stated in the agreement.  *Id.*

69.   Since an attorney undertakes to perform his duties pursuant to a contract with a client, in California a breach of contract action exists for legal malpractice.  *Neel v. Magana,*

**62**

*Olney, Levy, Cathcart & Gelfand,* 6 Cal. 3d 176, 181 (1971); *see also, Lysick v. Walcom,* 258 Cal. App. 2d 136, 148 (Cal. Ct. App. 1968).

70.  Legal malpractice consists of the failure of an attorney to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake. *Id.*

### 1.  **CAPACITY**

71.  A person entirely without understanding has no power to make a contract of any kind.  Cal. Civ. Code §38.  In California, a person lacks capacity if, when entering into the contract, the person was not mentally competent to deal with the subject of the contract with a full understanding of his rights. *In re Rains,* 428 F.3d 893, 901 (9th Cir. 2005)(*citing Smalley v. Baker,* 262 Cal. App. 2d 824, 832 (Cal. Ct. App. 1968).  The test in each instance is whether the person entering the contract understood the nature, purpose and effect of that action. *Id.*

72.  There is no issue of capacity in this case.

### 2.  **CONSENT**

73.  In California, a party's intent to contract is judged objectively by the party's outward manifestation of consent.  The test is what the outward manifestations of consent would lead a reasonable person to believe. *Beard v. Goodrich,* 110 Cal. App. 4th 1031, 1038 (Cal. Ct. App 2003).

74.   The testimony at trial showed that Lyddon and Rocha-Albertsen discussed and established an attorney-client relationship whereby Lyddon was to pay Rocha-Albertsen a monthly sum in exchange for the legal services Lyddon required.   Lyddon manifested his consent by, in fact, paying Rocha-Albertsen a monthly sum approximating $2000 and later $2,500, and by receiving Rocha-Albertsen's legal services in exchange.   Rocha-Albertsen manifested consent to this arrangement by accepting the monthly payments and providing the legal services for Lyddon throughout his relationship with Lyddon.   The attorney-client contract between Lyddon and Rocha-Albertsen was fully supported by express consent.

75.   There was no consent or meeting of the minds with respect to the $500,000 promissory note.   The facts show that Rocha-Albertsen did not discuss the note or its amount with Lyddon prior to drafting it and did not explain the terms of the note or the note's existence to Lyddon before asking Lyddon to sign it.

76.   The first time Lyddon became aware of the note was when he was served by Cuellar-Abundiz with the enforcement action brought on that note in Tijuana, MX.

77.   Lyddon did not expressly or impliedly consent to pay the $500,000 amount of the note.   The promissory note is unenforceable due to lack of consent and prevents the existence

**64**

of a valid or enforceable contract.

### 3.   LEGALITY

78.   An unenforceable contract is one for the breach of which neither the remedy of damages nor the remedy of specific performance is available, but which is recognized in some other way as creating a duty of performance, though there has been no ratification.   Restat 2d of Contracts, § 8 (1981).

79.   It is undisputed that the original attorney-client contract between Rocha-Albertsen and Lyddon was lawful.

80.   Under both California and Mexican law the promissory note was illegal because: (a) it was procured by fraud (breach of fiduciary duty to client to disclose the contents and meaning of the note) in the execution; (b) it exceeded the maximum percentage for a real estate transaction that an attorney in Mexico may earn; (c) it was procured without knowledge and informed consent of the client-promissor; (d) it was procured by self-dealing in violation of the attorney's duty to fully inform his client about the meaning and legal consequences of the document the attorney prepared for his client to sign.

### 4.   CONSIDERATION

81.   At minimum, consideration received must consist of a present, actual benefit bestowed or a detriment suffered. *Johnson v. Unocal Corp.,* 21 Cal. App. 4th 310, 316 (Cal. Ct. App. 1993).   The adequacy of consideration is tested as of the time of

the making of the contract. *A.J. Industries, Inc. v. Ver Halen,* 75 Cal. App. 3d 751, 762 (Cal. Ct. App. 1977).

82.   There is no dispute that consideration was present in the original attorney client contract between Lyddon and Rocha-Albertsen for their monthly services for flat fee arrangement. There was no consideration for the $500,000 promissory note.  At the time the note was signed, Lyddon did not owe Rocha-Albertsen $500,000 for legal services performed.  Rocha-Albertsen was paid monthly or periodically and as he performed services.  The Cabo San Lucas real estate transactions were a regular part of the Rocha-Albertsen's and Lyddon's ongoing legal business.  There was no oral agreement or written contract to pay Rocha-Albertsen 18% of the sale price of real property which was the subject of past services performed by Rocha-Albertsen for Lyddon as to the subject real property, which had been paid.  The note was never discussed or agreed to by Rocha-Albertsen and Lyddon.

### 5.   **LYDDON'S PERFORMANCE**

83.   Where performances are to be exchanged under an exchange of promises, and the whole of one party's performance can be rendered at one time, it is due at one time, unless the language or circumstances indicate the contrary.  Restat 2d of Contracts, § 8 (1981)  An offer of performance is of no effect if the person making it is not able and willing to perform according to the offer.  Cal. Civ. Code §1495.

84.   The facts establish that Lyddon and Rocha-Albertsen agreed to render their respective performances in installments throughout their attorney client relationship.   Lyddon performed his express agreement to pay Rocha-Albertsen monthly for his legal services by making monthly attorneys fees payments and periodic payments of expense reimbursements.   Lyddon performed the payment obligations on his part to be performed, under the terms of his legal services contract with Rocha-Albertsen.

### 6.   BREACH BY ROCHA-ALBERTSEN

85.   A plaintiff may establish a breach by showing that the defendant failed to perform an obligation under the contract without justification or excuse.   *Erich v. Granoff,* 109 Cal. App. 3d 920, 930 (Cal. Ct. App. 1980)(The unjustified failure of an obligor to perform a contract constitutes a breach of that contract).

86.   As part of an attorneys' professional obligations, an attorney is required to keep a client reasonably informed about significant developments and all material terms relating to the employment, representation, or performance of legal services for a client including promptly complying with reasonable requests for information and copies of significant documents when necessary to keep the client so informed.   *Chambers v. Kay,* 29 Cal. 4th 142, 157 (2002)(*citing* State Bar of California, Cal. Bar. Rules, Prof. Conduct, 3-500 (2006); Bus. & Prof. Code

**67**

§6068).  Mexican law is not different.

87.  An attorney owes a client a fiduciary duty of the highest good faith and fair dealing.

88.  An attorney has an ethical duty to disclose any matter to a client that could impact or damage a client.

89.  Rocha-Albertsen breached all his fiduciary duties of good faith and fair representation to Lyddon by providing an illegal note to Lyddon, intentionally withholding disclosure of its contents and without explanation of why Lyddon should sign such a note, with the intent to deceive Lyddon.  Even if the relationship was winding down, Rocha-Albertsen owed a duty of honesty and a fiduciary duty as to matters which were subject of the legal representation and with respect to which Rocha-Albertsen was asking Lyddon to contract.  Rocha-Albertsen at the barest minimum owed a duty to Lyddon that Lyddon had a right to consult an independent attorney before contracting with his attorney (present or former) for a promissory note.

90.  An agent is entitled to no compensation for conduct which is a breach of his duty of loyalty, if such conduct constitutes a willful and deliberate breach of a contract of service.  Rocha-Albertsen is not entitled to compensation even for properly performed services for which no compensation is apportioned.  11-60, Corbin on contracts §60.9, Restatement Second of Agency §569 (1957).  Rocha-Albertsen had no evidence

**68**

that preponderates to establish the basis for $500,000 of legal services.

91.   Rocha-Albertsen was never entitled to $500,000 from Lyddon's legal services or for any other reason.

92.   Rocha-Albertsen's evidence does not establish that he was owed any amount for unpaid attorney's fees from Lyddon, over and above the $20,000 Lyddon paid him.

93.   The relation between an attorney and client is a fiduciary relation of the highest character. *Lewin v. Anselmo,* 56 Cal. App. 4th 694, 701 (Cal. Ct. App. 1997).  A transaction between an attorney and client which occurs during the relationship and which is advantageous to the attorney is presumed to violate that fiduciary duty and to have been entered into without sufficient consideration under undue influence.  *Id.* The facts prove by clear and convincing evidence that Rocha-Albertsen breached his fiduciary duties as an attorney to Lyddon, his client.

94.   There was no consideration for the disputed promissory note which was procured by deception and under undue influence in a transaction that was not conducted at arm's length.

95.   The promissory note is void, illegal, and unenforceable by virtue of fraud in the execution.

**7.   DAMAGE TO LYDDON**

96.   For breach of an obligation arising from contract, the

**69**

measure of damages except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all detriment proximately caused thereby, or which in the ordinary course of things would be likely to result therefrom.   Cal. Civ. Code §3300.

97.   The basic object of damages is compensation, and in the law of contracts, the theory is that the party injured by a breach should receive as nearly as possible the equivalent of the benefits of performance.  *Aurbach v. Great W. Bank,* 74 Cal. App. 4th 1172, 1191 (Cal. Ct. App. 1999)(*citing, Brandon & Tibbs v. George Kevorkian Accountancy Corp.,* 226 Cal. App. 3d 442, 455 (Cal. Ct. App. 1990).)   Contractual damages are of two types: general damages and special damages.  *Lewis Jorge Construction Management v. Pomona Unified School District*, 34 Cal. 4th 960, 968 (2004).

98.   General damages are often characterized as those that flow directly and necessarily from a breach of contract, or that are a natural result of the breach.   *Id.*   General damages are foreseeable at the time the parties entered into the contract. *Id.* (general damages are often said to be within the contemplation of the parties, because their occurrence is sufficiently predictable.)

99.   Unlike general damages, special damages are those losses that do not arise directly and inevitably from any similar

breach of any similar agreement. *Id.* Instead, they are secondary or derivative losses arising from circumstances that are particular to the contract or to the parties. *Id.* Special damages are recoverable if the special or particular circumstances from which they arise were actually communicated to or known by the breaching party (a subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an objective test).

100. In this case the damage to Lyddon is comprised of the expense for attorneys, travel, and lodging incurred in defending against Rocha-Albertsen's transfer of the note to Cuellar-Abundiz and the conspiracy with Cuellar-Abundiz to obtain a personal financial advantage over Lyddon, whereby Rocha-Albertson would obtain at least $200,000 to satisfy his debts to Cuellar-Abundiz and Cuellar-Abundiz would first receive one-half or $250,000 of the proceeds, his debt from Rocha-Albertsen, and an additional one-half of the net proceeds.

101. It was incumbent on Lyddon to prove the amount of actual damages with admissible evidence. He did not offer such proof.

**V.    FRAUD**

102. The elements of fraud are 1. a misrepresentation 2. knowledge or falsity 3. with the intent to defraud 4. justifiable reliance on the fraud and 5. resulting damage. *Robinson*

**71**

*Helicopter Co., v. Dana Corp.,* 34 Cal. 4th 979, 990 (Cal. 2004).

103.   The relationship of an attorney and client is one of agent and principal. *Shafer v. Berger, Khan, Shafton, Moss, Figler, Simon, & Gladstone*, 107 Cal. App. 4th 54, (Cal. Ct. App. 2003). As with other types of agency relationships, the law of misrepresentation applies to lawyers. *Id.* If activities of a non lawyer in the same circumstances would render the non lawyer civilly liable, the same activities by a lawyer in the same circumstances generally render the lawyer liable. *Id.*

104.   Where material facts are known to one party and not to the other, failure to disclose them is not actionable fraud unless there is some relationship between the parties which gives rise to a duty to disclose such known facts. *LiMandri v. Judkins,* 52 Cal. App. 4th 326, 337 (Cal. Ct. App. 1997). There are four circumstances in which non disclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff, (2) when the defendant had exclusive knowledge of material facts not known to plaintiff (3) when defendant actively conceals a material fact from the plaintiff and (4) when the defendant makes partial representations but also suppresses some material facts. *Deteresa v. ABC*, 121 F.3d 460, 467 (9th Cir. 1997); *LiMandri,* 52 Cal. App. 4th at 336.

105.   The first circumstance requires a fiduciary

relationship, it is present here as there is no evidence that preponderates to prove the attorney-client relationship between Lyddon and Rocha-Albertsen had ended.

106.   There is evidence that independently establishes a fiduciary duty between Rocha-Albertsen and Lyddon on September 24, 2004, because Lyddon had a long standing attorney-client relationship with Rocha-Albertsen, a personal friendship, and trusted Rocha-Albertsen as Lyddon's advisor.

107.   Each of the other three circumstances presupposes the existence of some other relationship between the plaintiff and defendant in which a duty to disclose can arise.  *Deteresa,* 121 F.3d at 467 (internal quotations omitted).  Such relationships "are created by transactions between parties from which a duty to disclose facts material to the transaction arises under certain circumstances.  *Id.* (parties entering into any kind of a contractual agreement).

108.   Rocha-Albertsen prepared the note for $500,000, an amount to which he was not entitled.  He had exclusive knowledge of the facts and knew Lyddon did not have such knowledge, because Rocha-Albertsen concealed the facts from Lyddon.  Rocha-Albertsen did not explain the note to Lyddon or tell Lyddon that Rocha-Albertsen had prepared such a note.  Rocha-Albertsen placed the note in with other papers to deceive Lyddon into thinking it was part of another transaction.

73

109.   Rocha-Albertsen had not performed legal services and had no other basis to then claim a $500,000 obligation from Lyddon.

110.   Rocha-Albertsen committed fraud against Lyddon which induced Lyddon to execute the promissory note.

111.   The September 24, 2002, promissory note is void and unenforceable.

112.   Such fraud in the execution is a complete defense to enforcement of the assigned promissory note against the original promissee, Rocha-Albertsen, and the current holder of the note, Cuellar-Abundiz.

### A.   THE PROMISSORY NOTE IS INVALID UNDER THE UNIFORM COMMERCIAL CODE

113.   A "note" is an irrevocable promise to pay made by the maker. *See,* U.C.C. § 3-104(e) (2005).   An instrument is a "note" if it is a promise.   *Id.*   The right to enforce the obligation of a party to pay a note is subject to the defense of fraud that induced the obligor to sign the instrument with neither knowledge or reasonable opportunity to learn of its character or its essential terms.   U.C.C. § 3-305(a)(1)(iii) (2005).

114.   A party to a contract may rescind the contract "if the consent of the party rescinding was obtained through fraud exercised by the connivance of the party as to whom he rescinds or of any other party to the contract jointly interested with

**74**

such a party."  Cal. Civ. Code § 1689 (2006).

115.  The testimony in this case showed that Rocha-Albertsen procured the promissory note by fraudulent concealment and misrepresentation and without Lyddon's knowledge or informed consent.  In fraudulently inducing Lyddon to sign the note, Rocha-Albertsen breached his duty to fully inform Lyddon about the meaning and legal consequences of the document that Rocha-Albertsen prepared.

116.  Lyddon's testimony proved he would never have agreed to sign the note, as it exceeded the maximum percentage for a real estate transaction percentage that an attorney in Mexico may earn.  The note was not intended as a fully integrated instrument expressing the full intent of all parties as it was procured by fraud.  Because the note was procured by fraud, the promissory note is void.

**VI.   CUELLAR-ABUNDIZ CANNOT LEGALLY ENFORCE THE PROMISSORY NOTE**

117.  To become a holder in due course of an instrument, such as a promissory note, under California Commercial Code § 3302(a)(2) the alleged holder must (a) give value; (b) in good faith; (c) without notice that the instrument is overdue, or has been dishonored, or that there is an uncured default with respect to payment of another instrument issued as part of the same series; (d) without notice that the instrument contains an unauthorized signature or has been altered; (e) without notice of

**75**

a claim to the instrument described in UCC § 3306; and (f)

without notice that a party has a defense or claim in recoupment

described in UCC § 3305(a).

118.   Here, California Commercial Code § 3305(a) provides:

except as stated in subdivision (b) (not here applicable), the

right to enforce the obligation of a party to pay an instrument

is subject to all of the following:

> (1) a defense of the obligor (Lyddon) based on . .
>
> . (B) ...illegality of the transaction which, under
>
> other law, nullifies the obligation of the obligor; (C)
>
> fraud that induced the obligor to sign the instrument
>
> with neither knowledge nor reasonable opportunity to
>
> learn of its character or its essential terms...

119.   Although Cuellar-Abundiz does not qualify as a holder

in due course due to his failure to inquire of Lyddon about the

note, which was highly suspicious, he is subject to the defense

of illegality of the note and also is subject to the defense of

fraud in the execution, pursuant to § 3305(a)(1)(B) for all the

reasons stated above.

120.   Here, Cuellar-Abundiz was on inquiry notice as to the

validity and circumstances under which Rocha-Albertsen acquired

the note from Lyddon.  He cannot take the promissory note as a

bonafide purchaser for value without notice.

121.   The evidence shows that the circumstances of the

enforcement agreement between Rocha-Albertsen and Cuellar-Abundiz

were such that Cuellar-Abundiz became a willing participant in an

intentional plan to enforce an illegal and fraudulent note

against Lyddon, whom he knew to be a resident of the State of

California and the United States.

122.   Cuellar-Abundiz was not a bonafide purchaser without

notice of the underlying fraud and deception due to his duty of

inquiry as to the circumstances of the execution and the illegal

nature of the promissory note. The 18% fee for real estate

services made the note independently unenforceable by him in any

status, including that as assignee, alleged holder in due course,

or purchaser for value without notice.  Where the underlying

obligation is void because induced by fraud in the execution and

illegal on independent grounds because not permitted by Mexican

law, even a bonafide purchaser for value claiming to be a holder

in due course cannot enforce the instrument.  *C.I.T. Corp. v.

Panac*, (1944) 25 Cal.2d 547, 548-549; *see also Danning v. Bank of

America*, (1984) 151 Cal.App.3d 961, 978.

123.   Here, because Rocha-Albertsen presented Lyddon a

document for a signature in blank which prevented Lyddon from

recognizing the nature or contents of the document, while

breaching Rocha-Albertsen's fiduciary duty to disclose its

meaning and contents, Lyddon was not negligent in failing to

learn the nature of the document.  The document is void for fraud

77

in the execution.

124.   Fraud in the execution occurs when a party is deceived as to the very nature of the agreement so the party does not know what he or she is signing or does not intend to enter into a contract at all. *Rosenthal v. Great Western Fin. Securities Corp.*, (1996) 14 Cal.4th 394, 419-420.  Both conditions have been proved here.  Fraud in the execution results in the contract being void *ab initio*.  *Rosenthal*, 14 Cal.4th at p. 419-20.

## VII.  **DETERMINATION OF FOREIGN LAW**

125.   Defendants argue that Lyddon has the burden of producing evidence of Mexican law to the effect that the concept of bona fide purchaser for value is also a Mexican legal principle applicable in this matter.

126.   A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice.  FED. R. CIV. P. 44.1.  The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  Id.  The court's determination shall be treated as a ruling on a question of law.  Id.

127.   Defendants filed a notice pursuant to Fed. R. Civ. P. 44.1 of their intent to submit "Article 8 of the Law for the Schedule of Fees for the State of Baja California" governing

**78**

attorney client fees in Tijuana, MX.

128.  Defendants argue that the state law causes of action do not apply because the events underlying the causes of action occurred entirely in Mexico.

129.  Defendants also argue that Lyddon has the burden of showing whether the concept of "purchaser for value" exists under Mexican law (presuming that Mexican law applies) and whether Cuellar-Abundiz qualifies as a "purchaser for value" of the promissory note under Mexican law.

130.  However, Defendants did not file a Rule 44.1 notice for any other matters pertaining to the application of Mexican law even though they raise arguments that Mexican law should apply.  Defendants did not submit evidence of any Mexican law concerning a bonafide purchaser or holder in due course. Defendants fail to meet their burden of proof on this issue.

131.  It has been determined that the forum court's state choice of law principles choose the law of California which pertained to Rocha-Albertsen's dealings as attorney-client and the transaction here at issue.  There is no need to apply the law of Mexico as to commercial instruments.

132.  Defendants appear to have provided what seems to be a full Spanish language version of the Law for the Schedule of Fees for the State of Baja California.  No party provided a complete translation.  In the Spanish version there are four chapters and

33 articles in the first chapter.  Defendants only translated a fraction of the Spanish version into English.  This law cannot be applied, as a complete and accurate translation, has not been provided.

**VIII.    <u>CONSPIRACY</u>**

133.   The elements of an action for civil conspiracy are: 1. formation and operation of the conspiracy by an agreement between two or more persons to commit an unlawful act or a lawful act in an unlawful manner; and 2. damage resulting to plaintiff; 3. from a wrongful act done in furtherance of a common design.  *Rusheen v. Cohen,* 37 Cal. 4th 1048, 1062 (Cal. 2006).

134.   A civil conspiracy does not give rise to a cause of action unless an independent civil wrong has been committed.  *Id.*

135.   Personal jurisdiction may be established based on acts by co-conspirators.  1 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE ¶ 108.42 (3rd ed. 2006).

136.   The general rule is that a plaintiff must make a prima facie showing of civil conspiracy to establish personal jurisdiction over a non resident.  Schwarzer, Tashima, & Wagstaffe, CAL. PRAC. GUIDE: FED. CIV. PRO. BEFORE TRIAL ¶ 3:88 (The Rutter Group 2006); see also, *Second Amendment Found. v. United States Conference of Mayors,* 274 F.3d 521, 524 (DC Cir. 2001).

137.   Plaintiff's evidence does not establish Cuellar-

**80**

Abundiz agreement with Rocha-Albertsen to participate in wrongful enforcement of an illegal and fraudulent promissory note against Lyddon.

138.  Even though Cuellar-Abundiz denied knowledge about the manner in which Rocha-Albertsen obtained the note from Lyddon, the inquiry does not end there.

139.  The evidence shows that Rocha-Albertsen owed an over four year old debt to Cuellar-Abundiz amounting to more than $100,000 for legal services.

140.  Rocha-Albertsen was in dire financial straits and could not pay the amount and may never be able to pay the amount.

141.  Cuellar-Abundiz's office continued to send Rocha-Albertsen invoices for the debt through November 2002.

142.  In November 2002, Rocha-Albertsen sent to Cuellar-Abundiz's office to verify that the Lyddon note was a legally enforceable document.

143.  Cuellar-Abundiz reviewed the note without in depth inquiry as to the basis for the amount of the obligation of $500,000 from Lyddon, Cuellar-Abundiz's former client.

144.  Rocha-Albertsen informed Cuellar-Abundiz that it was "to cover a final settlement of legal fees" between Rocha-Albertsen and Lyddon.

145.  At that point, Rocha-Albertsen and Cuellar-Abundiz entered into a contingency fee arrangement that involved

assigning Lyddon's note to Cuellar-Abundiz, who would seek enforcement of the note.

146.  The arrangement provided for 50% of the note ($250,000) to go to Cuellar-Abundiz to enforce the note in Mexican court; the next proceeds to satisfy Rocha-Albertsen's prior debt to Cuellar-Abundiz from the remainder 50% (an estimate of over $100,000), and remainder of the note to go to Rocha-Albertsen.

147.  In total, Cuellar-Abundiz would be receiving over $350,000 for a debt estimated at some amount over $100,000.

148.  When Cuellar-Abundiz took the note, he had knowledge that it was owed by Lyddon, a former client.

149.  Cuellar-Abundiz had knowledge that Lyddon had the ability to make good on the note, unlike Rocha-Albertsen who was insolvent.

150.  Cuellar-Abundiz unreasonably failed to then contact Lyddon to inquire about the note and if Lyddon would voluntarily pay it.

151.  Instead, Cuellar-Abundiz embarked upon a scheme with Rocha-Albertsen to take the note by assignment and to serve it on an unsuspecting Lyddon as part of a wrongful enforcement of the note.

152.  Neither Defendant provided any testimony to explain why Rocha-Albertsen felt compelled to verify the "validity" of

**82**

the note with Cuellar-Abundiz on November 12, 2002, if Lyddon had knowingly and voluntarily executed the note.  It would have been a single matter to telephone Lyddon to confirm payment of the note.

153.  The evidence conclusively establishes that Cuellar-Abundiz conspired with Rocha-Albertsen to surreptitiously set up the service of the complaint on Lyddon in the note enforcement suit in Tijuana outside Rocha-Albertsen's law office in February 2003.

**IX.  FINANCIAL ABUSE OF AN ELDER; WELFARE CODE §15610.30**

154.  "Financial abuse" of an elder occurs when a person does the following:

> 1.  Takes or retains real or personal property of an elder for wrongful use or with intent to defraud or both.
>
> 2.  Assists in taking or retaining real or personal property of an elder for a wrongful use or with intent to defraud or both.

Cal. Wel. & Inst. Code §15610.30.  A person is deemed to have taken or retained property for wrongful use if, among other things, the person take or retains possession of property in bad faith.  Id.  A person or entity is deemed to have acted in bad faith if the person knew or should have known that the elder had

**83**

the right to have the property transferred or made readily available to the elder or to his representative.  Id.  A person is deemed to or should have known of the elder's right if, on the basis of information received by the person, it is obvious to a reasonable person that the elder has such a right.  Id.

155.  "Representative" means a person that is either: 1. a conservator, trustee, or other representative of the estate of an elder or dependent adult or 2. an attorney in fact of an elder who acts within the authority of the power of attorney.  Id.

156.  Where it is proven by clear and convincing evidence that a defendant is liable for the financial abuse as defined in §15610.30 and that defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of this abuse in addition to all other remedies otherwise provided by law a court shall award to the plaintiff reasonable attorney's fees and costs.  *Covenant Care, Inc. v. Superior Court,* 32 Cal. 4th 771, 780 (Cal. 2004).

158.  The damages recovered shall not exceed the damages permitted to be recovered pursuant to subdivision (b) of §3333.2 of the civil code.[2]  *Id.*

159.  Elder abuse triggering a remedy under §15610.30 and its heightened remedy provisions entails by its nature egregious

---

[2] 3333.2 (b) states: "In no action shall the amount of damages for non economic losses exceed two hundred and fifty thousand dollars ($250,000).

**84**

conduct.  *Id.* at 789.

160.  The obtaining of a fraudulent and illegal promissory note does not meet the requirements for elder abuse, Rocha-Albertsen did not take or retain real or financial property of Lyddon.

**X.        VIOLATION OF CA BUSINESS PROFESSIONS CODE §17200**

161.  California Business and Professions Code section 17200 states:

> [Unfair] competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . .

162.  The purpose of the Unfair Competition Law (UCL) is protecting against conduct that "significantly threatens or harms competition." *Ariz. Cartridge Remanufacturers Ass'n v. Lexmark Int'l, Inc.*, 421 F.3d 981, 986 (9th Cir. 2005) [hereafter *Ariz. Cartridge*] (citing *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (Cal. 1999)).  This includes the public's right to protection from fraud and deceit.  *Ariz. Cartridge*, 421 F.3d at 986 (citation omitted).  The scope of section 17200 is broad, allowing courts to enjoin any unfair business conduct in any context it might occur.  *Id.* (citation omitted).

163.  Section 17200 provides three distinct types of conduct that constitutes unfair competition: 1) unlawful, 2) unfair, or

3) fraudulent.  *See Lippitt v. Raymond James Fin. Servs.*, 340 F.3d 1033, 1043 (9th Cir. 2003); *Cel-Tech Commc'ns*, 20 Cal. 4th at 180.

164.  A business practice can be unfair or deceptive without being unlawful and vice versa.  *Lippitt*, 340 F.3d at 1043.

165.   The unlawful prong uses violations of other laws and treats them as unlawful practices that are independently actionable under the UCL.  *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048; *Cel-Tech Commc'ns*, 20 Cal. 4th at 180.

166.   The unfair prong provides courts "broad discretion to prohibit new schemes to defraud."  *Paulus v. Bob Lynch Ford, Inc.*, 139 Cal. App. 4th 659, 682 (Cal. Ct. App. 2006); *People ex. rel. Lockyer v. Fremont Life Ins. Co.*, 104 Cal. App. 4th 508, 515 (Cal. Ct. App. 2002).

167.   The California Supreme Court has not given a definition as to what is unfair in the context of the UCL for injuries to consumers.  *See Fremont Life Ins. Co.*, 104 Cal. App. 4th at 515.   However, unfair business practices will include unconscionable provisions in standardized agreements.  *Id.* at 516.

168.   The fraud prong of the UCL is not like common law fraud.  *Id.*  The test is whether or not "the public is likely to be deceived."  *Id.* (citation omitted).  Thus, a section 17200 violation can be shown even if no one was actually deceived,

**86**

relied upon the fraudulent act, or suffered any damage. *Id.* at 517.

170. This case is a straight common law fraud case. No competition is present. An isolated instance of fraud under the circumstances proved here does not satisfy the purpose of Business and Professions Code § 7200. There is no unfair business practice within the meaning of the law.

**XI.   UNAUTHORIZED PRACTICE OF THE LAW**

170. California Business and Professions Code Section 6126(a) states:

> (a) Any person advertising or holding himself or herself out as practicing or entitled to practice law or otherwise practicing law who is not an active member of the State Bar, or otherwise authorized pursuant to statute or court rule to practice law in this state at the time of doing so, is guilty of a misdemeanor . . .

If Defendant violated this provision, he is liable under section 17200. *See Chabner*, 225 F.3d at 1048.

171. The predominant majority of legal work was performed in Mexico where Rocha-Albertsen was licensed to practice. This claim fails.

**XII.   REMEDIES UNDER SECTIONS 17203 AND 17535**

172. Section 17203, the statutory authorization for relief under the UCL, states:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or

87

employment by any person of any practice which
constitutes unfair competition, as defined in this
chapter, or as may be necessary to restore to any
person in interest any money or property, real or
personal, which may have been acquired by means of such
unfair competition.

Relief is in the form of an injunction against the offending

party, and restitution damages. *See Korea Supply Co. v. Lockhead*

*Martin Corp.*, 29 Cal. 4th 1134, 1147-48 (Cal. 2003).

174.   Section 17535 is the general remedy of injunctive

relief against an entity for false advertising.  It states:

Any person, corporation, firm, partnership, joint stock
company, or any other association or organization which
violates or proposes to violate this chapter may be
enjoined by any court of competent jurisdiction.

175.   Plaintiff has not proven the conduct complained of in

any way constitutes "competition" or that it had any anti-

competitive effect.

176.   Injunctive relief may not be issued in this case.

**XIII.**     **DECLARATORY RELIEF**

177.   The Declaratory Judgment Act provides that "in a case

of actual controversy within its jurisdiction... any court of the

United States... may declare the rights and other legal relations

of any interested party seeking such declaration, whether or not

further relief is or could be sought."  28 U.S.C. §2201(a).  Any

such declaration shall have the force and effect of a final

judgment or decree and shall be reviewable as such.  *Id.*  Before

**88**

declaratory relief can be granted, federal subject matter jurisdiction requirements must be satisfied. *Government Emples. Ins. Co. v. Dizol,* 133 F.3d 1220, 1222-1223 (9th Cir. 1998) (*citing, Skelly Oil Co. v Phillips Petroleum Co.*, 339 US 667, 671 (1950)).  The court's jurisdiction in this case is based exclusively on diversity of citizenship.

178.  In determining whether declaratory relief can be granted, an inquiry must be made as to whether there is a case of actual controversy between the parties.  *Principal Life Ins. Co. v. Robinson,* 394 F.3d 665, 669 (9th Cir. 2005); *American States Ins. Co. v. Kearns,* 15 F.3d 142, 144 (9th Cir. 1994).  Here, the controversy is actual and substantial.  It is rife for decision. *Kearns,* 15 F.3d at 144 (under Article III of the Constitution, it must be ripe for review).  *Id.*

179.  Here, Plaintiff seeks a declaration of the rights and duties of the parties respecting the promissory note.  Plaintiff is entitled to the court's judgment that the September 24, 2002, promissory note is void *ab initio* for fraud in the execution, illegality, and is unenforceable by any party.

## CONCLUSION

1.  Judgment shall be entered for Plaintiff John Lyddon against Defendants Rocha-Albertsen and Cuellar-Abundiz.

2.  The September 24, 2002 promissory note executed by John Lyddon, as promissor, is void and unenforceable.

**89**

3.   Plaintiff John Lyddon shall recover costs of suit from Defendants Rocha-Albertsen and Cuellar-Abundiz.

4.   Plaintiff shall lodge a form of judgment consistent with these findings with the court within five days following service of these findings.

IT IS SO ORDERED.

**Dated:   October 13, 2006         **        _____**/s/ Oliver W. Wanger**_____
dd0l0                                        UNITED STATES DISTRICT JUDGE

**90**